Roy SICKLES, Plaintiff-Appellee,

v.

GRAYBAR ELECTRIC COMPANY, Defendant-Appellant.

No. 11215.

United States Court of Appeals, Seventh Circuit.

Feb. 18, 1955.

Rehearing Denied March 8, 1955.

848

Glenn D. Peters, G. Edward McHie, and Peters & Highland, Hammond, Ind., of counsel, for appellant.

Jay E. Darlington, Hammond, Ind., for appellee.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a judgment, entered April 20, 1954, in favor of plaintiff and against defendant, in the amount of $40,000, for damages resulting from personal injuries sustained by plaintiff on Monday, January 24, 1949, because of the collapse of a scaffold on which plaintiff, an independent contractor, was performing services for and in the plant of defendant.

■ The important ground urged for reversal is that the evidence was insufficient to take the case to the jury on the issue of defendant's negligence, as alleged. This issue was appropriately preserved for review by defendant's motion during trial for a directed verdict and by its subsequent motion for judgment notwithstanding the verdict, both of which were denied by the trial court. After long study and a careful review of the evidence, we have reluctantly come to the conclusion that defendant's contention must prevail. We say reluctantly because we appreciate the fact that the issue has been passed upon by an able trial judge who perhaps was in a better position to evaluate all the circumstances than is this court. Even so, the issue of the insufficiency of the proof is pressed here, on which we are required to pass judgment.

Plaintiff, a carpenter and an independent contractor, was engaged by defendant to install beaverboard on the ceiling and walls of its warehouse in the city of Hammond, Indiana, and commenced such work on Saturday, January 22, 1949. Defendant's warehouse occupied about 10,000 square feet of floor space. The room or part where plaintiff was to perform his work, known as the receiving and shipping room, was about 15 feet in width (east and west) and 40 feet in length (north and south). On the east side of this room was a solid tile wall, except at about the midde there was a door which led to defendant's office located in the front of the building. In this room and along the wall on the east side were located three or four movable desks, one to the south of the door and others to the north. On the west side of this room was a row of steel shelving, with shelves about one inch thick, which contained storage space for defendant's merchandise. The same kind of storage space was provided on the opposite side of this steel shelving, making it accessible to the adjacent room on the west. This steel shelving occupied all the space on the west side of the room except at a point about the middle there was an open space about three feet in width, which afforded a means of passage from the receiving and shipping room into the adjacent room on the west. There was other steel shelving throughout defendant's warehouse, with which we need not here be concerned. The south end of this shipping and receiving room was open, into which outside trucks carrying defendant's merchandise backed for the purpose of loading and unloading. Merchandise was transported to and from this point to these storage units provided on the west side of the shipping and receiving room and at other points in the warehouse by means of platform trucks or carts about 30 inches wide and 4 feet long, some of which had a swivel wheel, providing a means of turning in short space.

It was necessary for plaintiff to have a scaffold on which he and his men could stand while performing the work for which he had been engaged. On Saturday morning plaintiff brought with him

all the material for a scaffold and soon after his arrival construction was commenced. The scaffold consisted of what is referred to as horses, of which there were three in number. A horse had four legs, two at each end. On each horse there was a 2 x 6 timber called a ledger, which ran from the top of one pair of legs to the other, and upon these three ledgers rested the platform upon which plaintiff and his men stood to perform their work. The legs of the horses consisted of 2 x 4 material about 7 feet long, in a V-shape, widening at the bottom so that the legs at that point were 42 to 48 inches apart. A cross timber ran from leg to leg to prevent spreading. The legs were fastened at the top by a patent metal bracket which had a flange fitting over the side of the legs, three bolts with wing nuts and six nails on each side. The legs did not come together at the top. A space was provided so that a 2 x 6 ledger could be laid on edge between the tops of the two legs of each horse. The ledgers were 13 to 13½ feet long and on each horse extended from one pair of legs to the other and beyond for a distance of 8 to 12 inches. (In other words, the ledgers, three in number, on which the platform rested extended substantially across the width of the room.) When in position each horse was located east and west, with one pair of legs near the tile wall on the east side and the other pair of legs near the steel shelving on the west side. The platform resting on the ledgers consisted of 12 to 18 planks of various widths, such as 2 x 8, 2 x 10, and 2 x 12. These planks were 16 feet in length and extended north and south over the three ledgers which, as noted, ran east and west.

Normally, stability for the scaffold would have been obtained by extending a piece of timber diagonally from the lower part of the V-shaped legs to about the center of the crosspiece (ledger). This, however, would have interfered with access by defendant's employees to the loading and receiving platform at the south end of the room. When defendant's foreman called this situation to plaintiff's attention, he devised an alternative means of providing lateral support which consisted of locating the horses so that the ledger would butt up against the wall at each side, that is, the tile wall on the east and a shelf of the steel cabinets on the west. It should be noted, however, that it was not contemplated that these ledgers should fit solidly against such support as this would interfere with moving the scaffold from one location to another. For this reason a space was left at each end of from one-half to three-fourths of an inch.

Plaintiff discussed with defendant's foreman this alternative method of lateral support for the scaffold and told him of the danger involved if the supporting horses were moved and thereby deprived of the support provided. There was evidence that the foreman and his men discussed among themselves the danger which lurked in the situation.

Plaintiff on Saturday morning commenced work on the ceiling at the south end of the room and the scaffold was located accordingly, with the ledgers supported by the tile wall on the east and by a shelf of the steel cabinet on the west. By 3:30 that afternoon the work over the scaffold was completed and it became necessary to move it farther north in the room, which was done, with the same means for lateral support.

It was shown by plaintiff or some of his witnesses that on Saturday three or four of defendant's employees were working in this room about and beneath the scaffold and that two of them were operating pushcarts carrying defendant's merchandise and, also, that outside trucks were backed into the room at the south end. (We think there is no reason, as will subsequently appear, to detail further facts as to what occurred on Saturday.)

Plaintiff and two of his men returned to work on Monday morning, where they were admitted at about 8 o'clock or shortly thereafter. It is plaintiff's theory, as shown both by his pleading and argument, that the west end of the south ledger and the legs which supported it

were moved from a position where the ledger was supported by a shelf of the cabinet to a point where it was without support, and that this lack of support was what caused the scaffold to collapse. There was considerable testimony as to the situation existing at the southeast portion of the scaffold but, in view of plaintiff's position, we think it bears no relevancy and need not be related.

It was shown that after the scaffold was moved on Saturday afternoon, the west end of the ledger was supported by a steel shelf at a point 12 or 14 inches south of the three foot opening leading into the west storage room. (This means that the platform of the scaffold extended across the opening and that the north leg of this west pair of legs extended into the opening.) Plaintiff and his men on Monday morning entered from the east (front) door, walked across the shipping and receiving room and through the opening on the west side for the purpose of getting their tools. They reentered through the same opening. They testified that the west end of the ledger and the supporting legs were in the same position as they had been placed on Saturday; more specifically, that the west end of the ledger was abutted against the metal shelf of the steel cabinet at a point 12 or 14 inches south of the opening.

Plaintiff and one of his men (a son) mounted the scaffold by way of a stepladder. Plaintiff tested the scaffolding by shaking it with his feet, that is, by placing his weight first on one foot, then the other, which is the method commonly used in the trade in testing a scaffold before its use. He found it firm, not moving over one-half inch. His first job was to install a ceiling light near the east side of the room (a desk was beneath the platform at this point), and in doing so, he took down an old bracket. A new bracket was required, and plaintiff and his son climbed down from the platform for the purpose of building the new bracket. Plaintiff at this time had been up on the platform about 15 or 20 minutes. At the time he got down from the scaffolding no person was seen in the room other than one of his own employees (Buse) who was on a stepladder located south of the scaffold, engaged in repairing a skylight. The new bracket was constructed in the south portion of the room and, together with the fastening screws, was carried by plaintiff up on the scaffold platform. It was about 15 minutes from the time they left the platform until their return. Plaintiff then started to install the new bracket over the desk with a heavy screwdriver. At this point, plaintiff's testimony is as follows:

"Q. All right, after you went back up on it, what did you do, what happened? A. Well, I went to screw this bracket into the ceiling with the screw. As I did, why, the scaffold went out to the west, out from under me to the west.

"Q. What part went out to the west? A. Well, the west end of the trestle went out west into this passageway between these bins or these shelves.

"Q. Where did the west end of that 2 by 6 ledger go? A. It went out through this opening, this passageway.

"Q. When you say it went out through there, you mean it went to the west? A. Yes."

As the scaffold started to collapse, plaintiff saw a man with glasses on working at the desk and jumped to avoid him. He landed on the concrete floor and received serious injuries, which need not be described in view of the limited nature of the question for decision. In installing the new bracket at the time of the scaffold collapse, plaintiff was standing at the east end facing east and perhaps it should be noted that his testimony regarding what happened at the west end was based on his observation after he was on the floor and had sustained his injuries.

The court in its charge to the jury outlined the allegations of negligence as contained in the complaint, as follows:

"(1) Said employee or employees tampered with and changed the sup-

port of said platform by moving one of said trestles out of the aforesaid position where plaintiff had placed it, to said position where it lacked lateral support and so that the platform was likely to collapse under the plaintiff.

"(2) Said employee or employees of the defendant then and there knew, or in the exercise of ordinary care should have known, that their said movement of said support would cause said platform to be unstable and likely injure the plaintiff or any' person thereafter going upon the platform, but nevertheless said employee or employees then and there and thereafter failed to inform or warn plaintiff of the fact that they had thus tampered with and moved said support."

It seems evident that this second act of negligence is dependent upon proof of the first. At any rate, it is not discernible how there could be negligence on the part of defendant's employees in failing to inform or warn plaintiff that they had tampered with and moved the support unless they had done so.

Plaintiff, in a brief which contains an extremely abbreviated statement of the evidence relied upon, more argumentative than factual, states:

"The collapse occurred by this top beam of the saw horse going west through the above mentioned opening, whereas it had been safely butted against the metal case 12″ or 14″ to the south of the opening an hour earlier.

"Sufficient evidence that this west end of the sawhorse beam was moved over to this opening during that hour Monday morning was provided both by the above mentioned physical fact of it collapsing west through the opening plus the fact which the defendant was obliged to and did stipulate with the plaintiff,—that long before the trial, this foreman, Bassine, signed a written statement in which he admitted that on this Mon-

day morning before the accident happened—

" 'the east end of the south sawhorse was still butted against the tile wall but the west end of this south sawhorse was not butted against the stock rack (metal case) any longer, as the west end was right in the doorway.'

"With the above physical fact sufficiently proven that this west beam of the sawhorse was moved into that position of peril between 8 and 9 A.M. Monday morning, there was ample ground for the jury to infer that it was done by one of defendant's employees * * *.' "

If the position of peril was created by defendant's employees, it must have been between 8:30 and 9 A. M. because they, other than its warehouse foreman, did not commence work until 8:30.

■ Moreover, as shown by this statement, plaintiff relies upon an admission contained in a statement made by defendant's foreman, Bassine. This statement was admitted under the following circumstances: Bassine, a defendant's witness, was interrogated on cross-examination concerning a statement made by him out of court, allegedly contrary to certain answers which he gave as a witness. In rebuttal, plaintiff was about to introduce extracts from the statement asserted to be contradictory when defendant's counsel stipulated that the extracts were contained in the statement made by Bassine. It was expressly offered and admitted as an impeaching statement; obviously, it could not have been admitted for any other purpose. Defendant contends that the record does not disclose whether the impeaching matter relative to the location of the west end of the south horse referred to a time before or after the collapse of the scaffold. We think there is some ambiguity in this respect but, in any event, it cannot be utilized for any purpose other than impeachment. As was stated in Ohio & Mississippi Railway Company v. Stein, 133 Ind. 243,

246, 31 N.E. 180, 181, 32 N.E. 831, 19 L. R.A. 733,

"Impeaching testimony goes only to the credibility of a witness, and it cannot be given any force as evidence in proof or disproof of a disputed fact, except in so far as it bears upon the credibility of the witness it tends to impeach. [Citing cases.]"

To the same effect see Allen v. Davis, 99 Ind. 216, 217; Sanger v. Bacon, 180 Ind. 322, 328, 101 N.E. 1001 and Southern Railway Co. v. Gray, 241 U.S. 333, 337, 36 S.Ct. 558, 60 L.Ed. 1030.

■ It therefore appears plain under this firmly established rule that this impeaching statement cannot be considered as proof of defendant's negligence or as proof of any of the circumstances or factors upon which it is sought to infer negligence.

This also appears an appropriate place to comment upon other circumstances upon which plaintiff places much emphasis. Plaintiff in his brief states:

"The most important factual feature of the situation where the accident happened is that the plaintiff was obliged to do his work on this seven foot high scaffold while the defendant's employees did their regular work underneath the scaffold."

It is not discernible how this so-called important feature has any bearing upon the negligence with which the defendant was charged. Certainly it does not by inference or otherwise show or tend to show that defendant's employees tampered with the scaffold or that defendant failed to transmit to plaintiff any knowledge which it possessed that the scaffold had been tampered with. Also stressed is the fact that plaintiff did not brace the scaffold as he normally would have done because of defendant's request or suggestion that the space beneath the scaffold be kept open. This fact conceivably might have had some bearing upon the question of plaintiff's contributory negligence, an issue in the trial court. That issue, however, is not raised

here and we think it is immaterial to the issue of defendant's negligence as laid.

Obviously, both plaintiff and the defendant were aware of the hazard involved in the support method adopted. No inference can arise, however, that defendant's employees committed the acts alleged as constituting negligence because of knowledge of the hazard. If any inference is to be drawn from this circumstance, we think it would point in the opposite direction, that is, with knowledge of the hazard, defendant's employees as reasonable, prudent persons could be expected to exercise more than normal care and caution in their work and activities in and about the scaffold. And it should not be overlooked that any defect in the scaffold which impaired its stability presented a danger to defendant's employees quite as much as it did to plaintiff and his employees. The work of one group required them to pass beneath the scaffold while that of the other required them to be on top of it.

Testimony as to the number of defendant's employees who were working in and about the scaffold is uncertain. It appears that three or four of such employees were working in the shipping and receiving room on Saturday and that some of them were pushing hand carts, and that perhaps the same number were there on Monday morning. There was no proof, however, that any of such employees were at or near the southwest corner of the scaffold or that any employee passed through the opening nearby. The only persons shown to have passed through this opening on Monday morning were plaintiff and his workmen, who, as heretofore stated, went into an adjacent room to obtain their tools. Much is said relative to the lateral support provided for the scaffold but little as to the longitudinal support. True, it was shown that at the time the scaffold was constructed a crosspiece was fastened near the bottom of each pair of legs to prevent their spread. There was no evidence, however, that this crosspiece

was intact after the collapse or, for that matter, at any time after the scaffold was moved on Saturday afternoon. Neither was there any proof as to the condition of the metal bracket which fastened together at the top the two legs of the horse. The only evidence as to the physical situation after the collapse was that, as heretofore shown, the end of the ledger and the top of the two legs were pointed into the opening at the west.

We recognize that plaintiff is entitled to have the evidence considered in the light most favorable to him, and we have attempted to state the facts accordingly. The lengthy statement which we have made, much of it perhaps unnecessary, is due to our inability to cull from the mass of evidence that which is favorable to plaintiff's cause of action as alleged. In any event, we believe we have given a fair résumé of the proof as adduced by plaintiff. For our present purpose we need not be concerned with the testimony of defendant's witnesses except in one respect. Defendant produced its payroll record, containing the names of all its employees who were at work on Monday morning, including its warehouse employees. A number of them testified and expressly denied that they touched, tampered or interfered in any manner with the scaffolding or any of its parts. As to all others who were not called, it was stipulated that they would testify likewise if called as witnesses.

Plaintiff by a process of elimination concludes that the west end of the south ledger was moved into a position of peril by defendant's employees. In his brief he states (1) that there is no evidence that it was moved by the plaintiff and his helpers, (2) that it was a physical impossibility that this "large sawhorse" moved itself, and (3) that there is no evidence that it was moved by outsiders. The argument proceeds:

"And while it is not contended they [defendant's employees] did it wilfully, there was ample opportunity and motive for them to move it, either by giving it a shove with one of their swivel hand trucks which admittedly were working under it, or by an employee thoughtlessly shoving it to one side so he could get into one of those 'bins' which the west legs of the sawhorse admittedly obstructed while in the safe position."

It appears that this argument without so stating invokes the aid of the doctrine of *res ipsa loquitur*. That doctrine was defined in San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 98, 32 S.Ct. 399, 401, 56 L.Ed. 680, as follows:

"* * * when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care."

Obviously the doctrine is without application because the thing which caused the injury, that is, the scaffold, was constructed and owned by plaintiff, an independent contractor, and under his exclusive control.

There is no direct proof of any link in the chain by which it is sought to fasten negligence upon defendant. The first essential step on plaintiff's theory was to show that the scaffold collapsed because the west end of the south ledger, together with the supporting legs, was moved from a point of safety to one of peril. If plaintiff's burden ceased with proof of that link in the chain, we would agree that a jury question was presented, even though the physical facts enshroud the cause of the collapse with much doubt. It is just as reasonable, in our judgment, to believe that the collapse was or might have been caused by a spread of the legs which were 40 to 48 inches apart at the bottom, which could have resulted in the ledger and the top of the legs being thrown into the open space. However, accepting the premise

as to the cause of the collapse as urged by plaintiff and as the jury evidently found, the next and vital question is whether the support was moved by one of defendant's employees.

We think there is no reasonable basis upon which this issue can be resolved in plaintiff's favor, either by inference or otherwise. No employee of the defendant was seen at or near this southwest corner of the scaffold at any time, and particularly on Monday morning. It is argued (as above shown) that defendant's employees had the "opportunity and motive" either by shoving it with a hand truck or thoughtlessly shoving it to one side. It taxes all credulity to believe that this horse could have been moved by one person thoughtlessly, accidentally or inadvertently. Its movement would have required a superman and one acting deliberately. The record does not disclose the weight which rested upon the ledger and sawhorse but it is evident that half the weight of the scaffold at the south end rested upon it. We have heretofore given the dimensions of the various parts which entered the construction of the scaffold and of the parts which constituted the platform. This at the time of the collapse carried the weight of two men, their tools and the material being used. It was necessary that the ledger and supporting legs be moved for a distance of more than 12 to 14 inches before the ledger would be without support. No explanation is made and we doubt if any could be as to how one man or two men could move this construction by carelessness, inadvertence or accident. But plaintiff argues that defendant's employees had "ample opportunity and motive" to move the supporting legs. Even so, it is not inferable therefrom that any employee performed the act asserted. They had no different or better opportunity than plaintiff and his employees and, being aware of the danger, it cannot sensibly be inferred that they deliberately committed an act which endangered their own safety as much as that of plaintiff and his men.

Moreover, this essential inference, discernible to plaintiff, is contradicted by the positive testimony of each of defendant's employees who were at the premises on Monday morning. Relative to a similar situation, the court in Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 340, 53 S.Ct. 391, 394, 77 L.Ed. 819, made the following pertinent statement:

"And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist."

If it be thought, however, that the jury had a right to discredit the testimony of defendant's employees on this point, there remains a failure of proof that the scaffold was moved or tampered with by one of them. See Moore v. Chesapeake & Ohio Railway Co., 340 U.S. 573, 577, 71 S.Ct. 428, 95 L.Ed. 547.

Plaintiff cites and relies upon a number of cases which hold that a verdict may be sustained on circumstantial evidence. Carter v. John Hennes Trucking Co., 7 Cir., 210 F.2d 443, 445–447; Pohlman v. Perry, 122 Ind.App. 222, 228–230, 103 N.E.2d 911, 914; Chicago, I. & L. R. Co. v. Pritchard, 168 Ind. 398, 411–413, 79 N.E. 508, 81 N.E. 78; Kempf v. Himsel, 121 Ind.App. 488, 516, 98 N.E.2d 200. An examination of these cases discloses that they are of little if any aid to plaintiff in the instant action. Generally there was direct proof that the defendant committed or was responsible for an act and it was held that whether the act constituted negligence was a matter to be inferred by the jury from the circumstances. In the Carter case, it was a block of wood left in a position by the defendant where it should not have been and which fell, causing in-

jury to the plaintiff. Whether defendant's act constituted negligence was a matter which the jury could infer from the circumstances. The court, 210 F.2d at page 445, stated that "due care, negligence, and proximate cause may be established by circumstantial evidence." In the Pohlman case, plaintiff's wagon and tractor were struck from the rear by defendant's automobile on a public highway. The only inference which the jury was required to make was whether defendant's act was negligent. In the Kempf case, plaintiff's decedent was allegedly killed by a car driven by the defendant, which the latter denied. The circumstances, however, showed without doubt that it was the defendant's car and there being no denial of negligence on his part, he was held negligent as a matter of law. In the Pritchard case, the cause of the accident was proven by direct evidence to be the defendant's act. The case appears to have turned on the issue as to whether plaintiff's decedent was a trespasser at the time he was killed. The court held that the jury was entitled to infer from the circumstances that he was not.

Plaintiff also cites Orey v. Mutual Life Insurance Company of New York, 215 Ind. 305, 19 N.E.2d 547, as authority for the proposition that the sometimes stated rule that an inference cannot be based upon an inference has been repudiated in Indiana. Even so, in view of our analysis of the situation, we think such repudiation is of little consequence here. A more pertinent rule announced by the court in that case is that a trier of the facts is not permitted to draw an inference based upon conjecture, speculation and guess.

Obviously, there can be no inference of negligence without proof of the act alleged to give rise thereto. And, as all must admit, there is no direct proof and we think no circumstantial evidence by which it could reasonably be inferred that the scaffold support was moved into a place of danger by defendant's employees. A finding in favor of the plaintiff on this essential element of his case can rest upon nothing more than conjecture, speculation and guess.

The judgment appealed from is reversed and the cause remanded, with directions that it be vacated.