Hermenegildo Perez, Plaintiff-Appellant, v. The Baltimore and Ohio Railroad Company, and The Baltimore and Ohio Chicago Terminal Railroad Company, Defendants-Appellees.

Gen. No. 47,749.

First District, First Division.

February 1, 1960.

Released for publication February 24, 1960.

Piacenti and Cifelli, and Warren J. Hickey, of Chicago (Edward Wolfe, of counsel) for appellant.

Noah Walker and Richard Allen, of Chicago, for appellees.

PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

A verdict of not guilty was returned in this personal injury suit, which charged that the defendants failed to provide the plaintiff with reasonably safe tools and with a reasonably safe place to work. The plaintiff complains of the admission of improper evidence, of the giving of erroneous instructions and of the prejudicial misconduct of the defendants' attorney.

The plaintiff was employed as a laborer. On February 27, 1956, he was a member of a five-man section crew engaged in tightening track bolts with wrenches furnished by the defendants. He testified that his wrench, which he had used all morning, was worn at its mouth and that he had reported this condition to his foreman at some previous time. He said that as he was working in the early afternoon, his wrench slipped from a bolt, causing him to lose his balance and, because of snow and ice on the ground, he fell and struck his head on a rail. He said he was knocked unconscious and did not come to until he was in a hospital. The defendants claim that he fell because of the spontaneous bursting of a congenital aneurysm at the base of his brain.

Perez was in the hospital for 26 days. During this period, and afterwards, he was examined by several doctors. All who testified agreed that his illness came from the rupture of an aneurysm, which was defined as a bulge or pouch in the wall of an artery. The question before the jury on this subject was whether the rupture occurred before Perez fell or whether it resulted from an injury to his head caused by this fall.

One specialist said it was possible the rupture could have been caused by a fall with trauma. However, he had previously stated that in his opinion the plaintiff had "a spontaneous hemorrhage and as a result, he fell." Two other specialists testified they had never known of an aneurysm rupturing due to trauma. In relating the history of his case to these two doctors

208

Perez had said that at the time he was tightening a nut he felt a pain at the back of his head, lost his vision, tried to talk but could not, passed out and, after regaining consciousness, was taken to the hospital.

Of the four members of the section crew only one saw the plaintiff fall. This witness said that he was facing Perez from about 25 feet away, saw him stumbling, and that he staggered sideways for about 15 feet. This man went to his aid but did not reach him before he fell backwards. Two members of the crew testified that Perez was conscious after he fell. One asked him what happened and he replied, "I got dizzy."

Two of his fellow workmen accompanied him to the hospital. In the emergency room one asked him what had occurred and Perez replied that he had felt a pain in the back of his head, his eyes blurred and he was shaky and after that "he couldn't tell what happened." This man talked to him the following day and again asked him what had happened. Perez answered that he had felt a pain and "then something like ticklish in the back" and that he just fell and passed out.

When he first entered the hospital he told the examining intern that he was there because he felt dizzy with a headache while he was working. A physical examination was made at that time by the intern and later by his family physician, who attended him daily. There were no swellings, black and blue marks, lacerations or abrasions on his head or neck.

██ This is a case under the Federal Employers' Liability Act and, since a review of the record discloses a substantial evidentiary basis for the verdict, we turn to the consideration of the errors which the plaintiff contends deprived him of a fair trial. Pennell v. Baltimore & O. R. Co., 13 Ill.App.2d 433; Bowman v. Illinois Cent. R. Co., 11 Ill.2d 186. In doing so we are immediately confronted with the assignment of numerous errors which were not mentioned in the plaintiff's

post-trial motion. Other errors were specified therein. When a written post-trial motion is filed and errors are specified in it, it is the rule that those not included in the motion are regarded as waived upon appeal. School Trustees v. Batchelder, 7 Ill.2d 178.

In reference to his assertion that the trial court erred in admitting improper evidence, the plaintiff contends that paragraph 6 of his post-trial motion covers all errors of evidence raised on appeal. This paragraph is as follows: "6. The Court erred in admitting improper evidence offered by the defendant at the trial of said cause over the objection of the plaintiff." The Civil Practice Act (68.1(2), ch. 110, Ill. Rev. Stat. 1959) states: "The post-trial motion must contain the points relied upon, particularly specifying the grounds in support thereof . . ." Paragraph 6 of the motion is a "point relied upon" but it satisfies only one requirement of the statute. The paragraph is general. It does not meet the further requirement of "particularly specifying the grounds in support thereof." The word "particularly" is opposed to generality. The word "specifying" means to define in detail. Either one of these words would suffice to show what is needed. The combination of both of them emphasizes the necessity of itemizing the grounds supporting the points advanced in a post-trial motion. A trial judge should have an opportunity to appraise the errors which are asserted to have taken place. It is unfair to charge him with errors in a reviewing court without having brought them to his attention so that a new trial could have been granted if he found it advisable. Illinois Cent. R. Co. v. Johnson, 191 Ill. 594; Pajak v. Mamsch, 338 Ill. App. 337. We will, therefore, consider only the errors which were particularly specified in the post-trial motion.

One of these pertains to the intern who examined Perez when he entered the hospital. We have

210

related his testimony. An objection was made to his testifying on the ground that his name had not been listed in the answer to an interrogatory asking the defendants to "State the names and addresses of each doctor or nurse who examined the plaintiff . . . the dates of the examinations . . . the dates of their reports to the defendant, the findings of each doctor . . . and whether or not said doctors and nurses were or are in the employ of the defendant." The answer was—"Numerous doctors, interns and nurses examined the plaintiff at St. Francis Hospital during the month he was there following the incident of February 27, 1956. None of these doctors, interns or nurses made any report to the defendant and none of them are in the employment of the defendant." The answer then gave detailed information about three other doctors who had made examinations and who had reported to the defendants.

This answer indicates that the defendants assumed the interrogatory was directed to those doctors who had made reports to them. Under this reasonable interpretation the interrogatory was answered fully and candidly. There was no attempt to conceal the name of anyone. The intern was not a witness peculiarly within the knowledge of the defendants. His name, the history he obtained from the plaintiff and the observations he made of him, were in the medical record of the hospital, which had been produced in court by the plaintiff's first witness. The plaintiff's attorney could not have been taken by surprise. The trial court ruled correctly in permitting the witness to testify. To have imposed the sanction sought by the plaintiff would have been unwarranted.

Three instructions given at the defendants' request are criticized. We condense them as follows: (1) the fact that the court has given instructions on damages is not to be taken as an indication by the court that the

defendants are liable; (2) the fact that the court submitted the case to the jury should not be taken as an intimation by the court that the defendants are liable; (3) the fact the plaintiff might have been injured does not of itself warrant the finding that the injury resulted from any negligence charged against the defendants. The plaintiff characterizes these as "mere fact" instructions and points to a line of decisions censuring such instructions. West Chicago St. R. Co. v. Petters, 196 Ill. 298; M. H. Boals Planing Mill Co. v. Cleveland, C., C. & St. L. Ry. Co., 211 Ill. App. 125; Wood v. Olson, 117 Ill. App. 128; Garvey v. Chicago Rys. Co., 339 Ill. 276. Such instructions have been disapproved because they select one item of evidence and then state that a certain conclusion does not follow, as a matter of law, from the one fact; this could be repeated item by item until all facts are exhausted, and thus it would be possible to reach a conclusion which might not be justified if all the items were taken together.

██ The use of the words "the fact that" do not of themselves make a so-called "mere fact" instruction. The first two of those summarized do not isolate an item of evidence. They caution the jury not to draw a wrong inference from what the court has said or done. They are far different from the instructions criticized in the decision cited. The third instruction more nearly approaches a "mere fact" instruction, but similar ones have been approved. Gibbons v. Chapin & Gore, 147 Ill. App. 575; Norkevich v. Atchison, T. & S. F. Ry. Co., 263 Ill. App. 1; McCabe v. Swift & Co., 143 Ill. App. 404. And under the facts of this case, where there was so much evidence that the injury resulted from natural causes and not from the negligence of the defendants, the instruction was entirely proper.

■ Two more instructions are objected to as being inaccurate statements of the law as it pertains to the Act under which this case was brought. Briefly, these instructions stated that there could be no recovery unless the defendants' negligence, in whole or in part, was the proximate cause of the plaintiff's injury. While the instructions could have been drawn more precisely, we do not think they could have misled the jury in this case.

■ Although some seven or eight charges of misconduct are raised in the plaintiff's brief, his post-trial motion specified but three. One of these took place during the opening statement of defense counsel and two during his final argument. In the opening statement the jury was told that one of the neurosurgeons who would testify was a Dr. Sugar, "the brain doctor . . . , who separated the brains of the Brodie twins." The operation on the Brodie twins had received wide publicity and the argument is made that this statement was an effort to impress the jury with the supposed outstanding qualifications of one of the defense witnesses. An objection to this remark was sustained, the defense attorney withdrew it and the judge instructed the jury to disregard it. We cannot see how the plaintiff was prejudiced, and the merit of the contention is even less discernible when we consider the subsequent testimony of the doctor. He said he was consulted about Perez in June 1956 and advised against an operation; he examined Perez in August 1958 and was of the opinion that Perez could do work which did not involve heavy lifting. Inasmuch as this was the extent of his testimony, stressing his qualifications could have been of little value to the defendants and of little harm to the plaintiff.

■ The same doctor was asked the following question: "In your experience, Doctor, have you ever

known of an aneurysm to rupture due to trauma or injury?" This has led to the second complaint of misconduct. In his final argument the defense counsel stated that Dr. Sugar had answered this question negatively. The plaintiff's counsel objected upon the basis the question never had been asked the doctor. Both attorneys were mistaken. The question had been asked but had not been answered because an objection to it had been sustained. The complaint now is that this was an attempt to influence the jury by misstating the evidence. There is nothing to substantiate this. It appears as if the error was inadvertent. Although Dr. Sugar had not said so, two other experts had answered they had never known of trauma rupturing an aneurysm. The evidence was in the record. We do not believe counsel's attributing it to the wrong witness prejudiced the plaintiff.

The third complaint against the defendants' attorney arises from his comments about Dr. Mackay, a defense witness, who had testified what Perez had told him concerning the incident of February 1956. The plaintiff's 17 year old son, who had been present as an interpreter, contradicted the doctor. The son testified: "He did not ask me nothing to ask my father." In his address to the jury the plaintiff's attorney said: ". . . if he made certain statements to those doctors and they were made to his son, the best way to find out was bringing in the son. And you saw little Raymond, and he goes to high school now, and if we are not going to believe Raymond, and I always say 'Out of the mouths of babes,' you get the truth, and we don't believe Raymond and we turn his father down, then I think something is wrong with our system of justice." In responding to this the defendants' attorney stated that Dr. Mackay had related the history as Perez gave it to him, that the doctor's record was in court, was

in his own handwriting and was accurate. He mentioned the amount the railroad paid the doctor for his medical services and then argued there could be no motive for the doctor to lie, for if he did so he would be risking a conviction for perjury, a penitentiary sentence up to 14 years and the loss of his license. He went on: "He spent thirty-two years building up his medical practice and he has a distinguished record. There are probably few neurologists in the world who have the background that Dr. Mackay has. Is he going to risk that and throw it all overboard and lie to you people?"

■■■ These comments are labeled "outrageous" and as "not based on any record or evidence." It is true there was nothing in the record showing the penalty for perjury, nor of the loss of a license because of committing perjury, but there was evidence of the compensation paid the doctor and of his eminent position in the medical profession as a neurologist. Under the circumstances prevailing at the time it was made, we find nothing seriously objectionable in the argument. This was not a situation where witnesses could have been mistaken; either one or the other was guilty of perjury. The veracity of a defense witness had been challenged by a flat denial of the conversation he reported had taken place, and by the opposing counsel saying that the plaintiff's son had to be believed or something would be wrong with our system of justice. The defense attorney had a right to reply and to argue that his witness should be believed; he did this by analyzing the doctor's testimony, the possible motives influencing him and the unlikelihood of a doctor of his stature falsifying.

■■■ While the attorney's fervency brought out matters beyond the record, they are not serious; it is common knowledge that lying under oath is a punish-

able offense, and that if a professional man were guilty of it, his standing in his profession would be jeopardized.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

SCHWARTZ and McCORMICK, JJ., concur.