Janina **PIETRUCHA**, Individually, and as Administratrix of the Estate of Albert Pietrucha, Deceased, Plaintiff-Appellant,

v.

**GRANT HOSPITAL**, a Corporation, Defendant-Appellee.

No. 18260.

United States Court of Appeals, Seventh Circuit.

Aug. 25, 1971.

Rehearing Denied Sept. 29, 1971.

Terence J. Tyksinski, Kenneth A. Knutson, Chicago, Ill., for plaintiff-appellant; Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., of counsel.

Francis D. Morrissey, Baker & McKenzie, Chicago, Ill., for defendant-appellee; Thomas F. Bridgman, William Joseph Linklater, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, and KILEY and PELL, Circuit Judges.

KILEY, Circuit Judge.

Plaintiff's decedent committed suicide in the psychiatric ward of defendant Grant Hospital. This diversity [1] wrongful death action by his widow followed. Verdict and judgment were for the hospital. Plaintiff has appealed. We reverse and remand for a new trial.

Decedent was admitted to the hospital September 24, 1967, at about 3:00 p. m. The head of the hospital psychiatric ward and nurse Joyce Laborde had been forewarned of decedent's extreme depression, his suicidal tendencies and his recent attempted suicide. After routine processing he was placed in a four-bed room in the psychiatric ward. The forewarning was noted in the nurse's log with a caution to watch closely for any suicide attempt. Nurse Laborde in-

---

1. Plaintiff is a citizen of the country of Poland, and defendant is an Illinois corporation.

structed Nurse Cecilia Pablo, in charge of the ward from 3:00 p. m. to 11:00 p. m., to watch decedent closely. Nurse Patiocina Cope, in charge from 11:00 p. m. on, was similarly informed. Decedent was found hanged with a belt in the men's washroom adjoining his room in the psychiatric ward at about 3:30 a. m.

## I.

■ Plaintiff contends the evidence entitled her to judgment as a matter of law. The hospital claims the evidence shows as a matter of law it was not guilty of a breach of any duty it owed to decedent, and that accordingly the verdict must be sustained. We disagree with both parties. In our view it was for the jury to decide whether the hospital, in its supervision of a patient with known suicidal tendencies, was negligent, and that on the evidence in this record the jury could reasonably have returned a verdict for either party. *See* Murray v. St. Mary's Hospital, 280 App.Div. 803, 113 N.Y.S.2d 104 (1952); Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743 (1953); Rural Education Association, Inc. v. Anderson, 37 Tenn.App. 209, 261 S.W.2d 151 (1953). However, we find reversible error in the district court's rulings which denied plaintiff a fair trial.

## II.

An important question at trial was whether the belt used in the suicide was or was not that of decedent. Oral testimony for plaintiff was that the belt was decedent's, and that it was not removed from his person during the hospital processing. A hospital manual of instruction required removal of the belt. The inventory made of articles removed from him does not list the belt. Testimony for the hospital was that the belt had been removed by a nurse during the admission proceedings and was placed in a drawer in the nurse's office in the ward.

Clearly the question was important: If the belt was decedent's and not removed as required by the manual, the jury might have found the hospital was negligent.[2] On the other hand, had the nurse removed the belt and placed it in the drawer, the jury might infer that the hospital was not responsible if during the routine fifteen minute check by the nurse of the rooms in the ward, decedent had not obtained another belt, removed the belt from the drawer.

In this factual context plaintiff moved, under Rule 43(b) of the Federal Rules of Civil Procedure, to call as an adverse witness hospital supervisor Royal who had charge of night nurses at the time. Plaintiff had prior information from police officers Ring and Schwarz that Royal had taken the belt from decedent's neck and had given it to the police at the scene, saying, "This is the man's belt. He should not have had it." The district court denied plaintiff's motion because Royal was not an "officer, director or managing agent" of the hospital, within the meaning of Rule 43(b).

■ In our view the ruling was a too literal application of Rule 43(b) and in the circumstances reversible error. We think that Royal, as supervisor of the night nurses, reasonably qualified as the hospital's "managing agent" subject to call as a witness adverse to plaintiff's interest. Royal's interests were identified with the hospital's and the hospital invested him with the supervisory power over the nurses with the duty to see that they furnished decedent proper care. Skogen v. Dow Chemical Co., 375 F.2d 692, 701 (8th Cir. 1967). *Cf.* Chumbler v. Alabama Power Co., 362 F.2d 161 (5th Cir. 1966).[3]

---

2. Dr. Alex Arieff, a certified neurologist and psychiatrist, testified that the standard hospital admission procedure in Chicago area hospitals for known suicidal patients was to search and remove belts, as well as other potentially dangerous objects.

3. Plaintiff made no offer of proof when her motion to call the hospital's Dr. Rodriguez as an adverse witness under 43(b) was denied, and we are unable to say that she was prejudiced by that ruling.

Upon denial of her motion, plaintiff called Royal as her own witness, apparently gambling that he would testify in accordance with the prior information she had. She lost the gamble. He testified that he did not know whom the belt belonged to. Technically she was bound by that testimony and could not rebut the testimony by calling her prior informants. We are not disposed to leave plaintiff entrapped on the ground that she gambled and lost. We think the court's ruling induced the gamble.

### III.

Plaintiff called Dr. Zaldivar as her witness. The district court rejected his testimony because his name was not given defendant in an interrogatory concerning doctors who had treated decedent prior to his admission into defendant hospital.[4]

Plaintiff's offer of proof indicated Dr. Zaldivar had treated decedent in Loretto Hospital during a two week period about six months previously. The diagnosis then was "acute" schizophrenia. Dr. Zaldivar would have testified that in the two weeks decedent had responded progressively to treatment and was discharged with advice for further psychiatric care.

A theory of the hospital's defense was that decedent's condition was chronic and that a person with chronic suicidal tendencies will inevitably commit suicide even if the hospital exercises reasonable care toward him. Dr. Zaldivar's testimony therefore was important to the question whether the hospital breached its duty of reasonable care. And if de-

cedent's condition was acute and curable, his widow's prospect for compensatory damages was enhanced.

■ Defendant had notice, in interrogatories, of decedent's confinement in Loretto Hospital[5] and had the Loretto records for a year before trial. The records named Dr. Zaldivar as decedent's attending physician. And plaintiff's deposition indicates that she did not, at that time, know the name of the doctor who treated her husband at Loretto Hospital. We think the district court's ruling in this case was too narrow for substantial justice. And we see no prejudice suffered by defendant. Defendant says that if the doctor's name was on the interrogatory, it would have assumed that he would be called as a witness for plaintiff, and would have deposed him before trial. But it did not subpoena or depose any of the other doctors listed by plaintiff in her answer to the same interrogatory question, including Dr. Hatz, a psychiatrist who procured decedent's admission into defendant hospital; and it knew before trial that Dr. Zaldivar treated decedent.

Battershell v. Bowman Dairy Co., 37 Ill.App.2d 193, 185 N.E.2d 340 (1962), relied upon by defendant, does not compel our sustaining the court's ruling on the facts here. There is nothing in the court's opinion there to require the exclusion of testimony of a witness not listed in interrogatory answers when the name of the witness was not peculiarly within the knowledge of the answering party.

The decision in Perez v. Baltimore and Ohio R. Co., 24 Ill.App.2d 204, 164 N.E.

4. The relevant interrogatory questions, and plaintiff's answers, were: Interrogatory No. 8: Within five years prior to the complained of occurrence of September 24, 1967, was the decedent, Albert Pietrucha, treated, tested or examined by any medical personnel, hospitals, clinics, laboratories or other similar institutions? Answer to Interrogatory No. 8: Yes. Interrogatory No. 9: If your answer to the foregoing interrogatory is in the affirmative, then state the following:

a. The name, residence or business address and telephone number of such person and/or institution.
\* \* \* \* \*
Answer to Interrogatory No. 9:
a. Loretto Hospital, 645 S. Central, Chicago;
Dr. Rudolph Hatz, 3166 N. Lincoln Ave., Chicago;
Dr. Pietrasic, 5720 W. Fullerton, Chicago;
Unknown doctor on Michigan Avenue.

5. See n. 4, *supra*.

2d 209 (1960), is much closer to the facts of the case before us. The court there permitted an intern to testify for defendant, although his name was not listed by defendant in answer to plaintiff's interrogatories concerning doctors, because the intern was not a witness peculiarly within knowledge of defendant, and his name, the history he obtained from, and observations he made of, plaintiff were in the medical records which had been obtained and produced.

## IV.

■ The court committed reversible error in permitting defense counsel to argue to the jury, over plaintiff's objection, that there was an issue as to whether decedent "voluntarily committed suicide" and that if the jury believed that decedent did voluntarily commit suicide, "then my client is not responsible under any circumstances at all." This argument misstated the law, created an irrelevant "fact question," and thereby misled the jury. There was, of course, no issue as to whether decedent "voluntarily committed suicide" if "voluntarily" is taken to mean that decedent killed himself. No one contends that he did not. Nor on this record can there be an issue if "voluntarily" is taken to mean that the suicide resulted from a free and controlled choice during a lucid interval.

■ The complaint alleges that decedent was in a mentally defective condition dangerous to himself, that the hospital knew it, that decedent was in such exercise of due care as his mental condition permitted and the hospital failed to exercise ordinary care to safeguard him against suicide. This stated substantially a res ipsa loquitur claim, Voss v. Bridwell, 188 Kan. 643, 364 P.2d 955 (1961), although the complaint also alleges specific negligence. And plaintiff proved a prima facie res ipsa loquitur case by showing that the hospital had exclusive control of decedent and the occurrence was one that would not ordinarily take place. Meier v. Ross General Hospital, 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519, 522–525 (1968); Vistica v. Presbyterian Hospital and Medical Center, 67 Cal.2d 465, 62 Cal.Rptr. 577, 432 P.2d 193, 196 (1967).

In a res ipsa loquitur case involving a hospital's duty to a psychiatric patient, defense counsel misstated the law in telling the jury that plaintiff could not recover if decedent's death was due to any voluntary action on his part, "without explaining that [the] voluntary conduct had to be the responsible cause of * * * death." *Vistica, supra,* 67 Cal.2d at 471, 62 Cal.Rptr. at 580, 432 P.2d at 196. We take "responsible" to mean a controlled action which proximately caused the death.

■ The hospital held itself out as rendering the kind of psychiatric service that plaintiff sought for decedent and accordingly it had the affirmative duty to protect decedent against his own action. *Cf.* Prosser, Law of Torts 336 (3rd ed. 1964). The hospital

> must exercise such reasonable care toward a patient as his mental and physical condition, if known, require; the duty extends to safeguarding the patient from dangers due to mental incapacity; and where the hospital has notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself or others unless preclusive measures were taken, then the hospital must use reasonable care in the circumstances to prevent such harm. Vistica v. Presbyterian Hospital and Medical Center, *supra,* 67 Cal.2d at 469, 62 Cal.Rptr. at 580, 432 P.2d at 196.

Decedent's "voluntary participation" in his act of self-destruction alone does not preclude an inference that "it was more probable than not that the hospital breached its duty of care to protect [decedent] from [his] own actions, voluntary or involuntary." *Id. See also* Meier v. Ross General Hospital, *supra.* And where, as here, the relationship of hospital and patient is created and the hospital claims that decedent may have in a lucid interval destroyed himself, it

has the burden to show that the lucid interval existed and that therefore its conduct was not the proximate cause of decedent's death. Here there was no evidence that decedent was lucid at the time he committed suicide, and therefore defense counsel's argument was improper.

Stasiof v. Chicago Hoist and Body Co., 50 Ill.App.2d 115, 200 N.E.2d 88 (1964), aff'd sub nom. Little v. Chicago Hoist and Body Co., 32 Ill.2d 156, 203 N.E.2d 902 (1965), does not justify the jury argument of defendant's counsel. The question in that case was with respect to the foreseeability of an attempted suicide committed five years after an automobile collision during the interim plaintiff had lived a reasonably normal existence. The court held that the suicide was an intervening, superseding cause. The citation of McMahon v. City of New York, 16 Misc.2d 143, 141 N.Y.S. 2d 190, 192 (1955), also misses the point. The court there was speaking of a sane man who, having been injured by the tortious act of defendant, becomes insane and takes his life. This was held not an event that could be foreseeable so as to warrant "aggravating" damages. There is a substantial difference between holding one liable to foresee the suicide of a person sane when injured who later commits suicide, and holding a hospital liable where it admits a psychiatric patient with known suicidal tendencies.

Nor does Strasberg v. Equitable Life Assurance Society, 281 App.Div. 9, 117 N.Y.S.2d 236 (1952), or Franklin v. John Hancock Mutual Life Ins. Co., 298 N.Y. 81, 80 N.E.2d 746 (1948), involving the question whether a person who commits suicide can recover on an accident or life policy which expressly excludes suicide coverage, supports defendant's contention. The claimant there must show that the insured at the time of his suicide is insane "without appreciation of the physical consequences of his action or without power to resist the disordered impulse that impelled him to end his own life." Franklin v. John Hancock

Mutual Life Ins Co., 298 N.Y. at 84, 80 N.E.2d at 748.

### V.

It follows from the above discussion that we think the district court on retrial should not reject plaintiff's instruction 17, which states the substance of the rule referred to above with respect to a hospital which has notice of the suicidal tendencies of one of its patients. Kent v. Whitaker, 58 Wash.2d 569, 364 P.2d 556 (1961). We need not discuss other instructions with respect to voluntariness disputed on appeal. It is enough to say that in view of our finding—that on this record there is no issue of voluntariness —the disputed instructions have no place on this record. On retrial, instructions should be framed and given in accordance with the views expressed in this opinion.

### VI.

We conclude that the judgment must be reversed and the cause remanded for new trial, because of the court's erroneous ruling with respect to the Rule 43(b) question, the refusal to permit Dr. Zaldivar to testify, and error in instructing the jury.

Reversed and remanded for new trial.

PELL, Circuit Judge (dissenting).

This is a case the facts of which cannot but help to arouse feelings of sympathy. The decedent, who was 42 years of age, with a life expectancy of nearly 30 years, apparently happily married with six children the oldest of whom was 18 years of age, entered defendant hospital in a ward devoted to the care of the mentally ill and although the hospital and its staff were adequately warned of suicidal prevention necessity, he nevertheless during the night of his first visitation to the hospital committed suicide.

I agree with the majority opinion that this was a case in which the jury should decide whether the hospital was negligent and that upon the evidence which

was before the particular jury here involved, the jury might have gone either way. It, of course, is not for us to say how we would have decided the case for that is not within the scope of our review.

The jury heard a vigorously prosecuted and vigorously defended case and returned its verdict for the defendant. The majority is of the opinion that certain of the district court's rulings prevented a fair trial to the extent of necessitating a new trial. I disagree and therefore respectfully must dissent.

Beginning with the assumption that the defense verdict was adequately supported by evidence, it is necessary in seriatim to analyze each of the grounds advanced by Judge Kiley as a basis for reversal, not discounting the fact that sometimes a cumulative effect of errors is sufficient for reversal notwithstanding that none of the charged errors individually is adequate for that purpose.

On the other hand, we must consider the specified grounds of error in the context of the trial as a whole. Sometimes a particular act or statement, *e.g.*, of counsel in argument, in isolation appears to be prejudicially erroneous but viewed in its setting of the litigation it pales to relative insignificance insofar as its effect on the outcome of the case is concerned.

The majority opinion finds reversible error first in the district court's denial to plaintiff of the right to treat a night supervisor of nurses, one Vincent Royal, as an adverse witness under Rule 43(b) Fed.R.Civ.P. As an initial matter it appears to me that the trial court's ruling was correct. However, even if it had not been, it constituted harmless error.

It is clear that Rule 43(b) does not provide that *"any"* employee of an adverse party may be called adversely." Hosie v. Chicago & North Western R. Co., 282 F.2d 639, 641 (7th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961) (Emphasis supplied.) Plaintiff citing Skogen v. Dow Chemical Co., 375 F.2d 692 (8th Cir. 1967), contends that the Rule should be liberally interpreted and no doubt this is the present day tendency.

The question posed here is similar to that presented by Rule 32(a)(2) (formerly Rule 26(d)(2)) dealing with depositions of "a managing agent."

The following discussion of the matter appears in 2A Barron & Holtzoff-Wright Federal Practice & Procedure § 642.1 p. 30 (1961):

"The meaning of the term 'officer' has caused no difficulty, but 'managing agent' has required definition. Though the question of whether a particular person is a 'managing agent' is to be answered pragmatically on an ad hoc basis, the courts look to see if the individual involved is invested by the corporation with general powers to exercise his discretion and judgment in dealing with corporate matters, whether he can be depended upon to carry out his employer's direction to give testimony at the demand of a party engaged in litigation with the employer, and whether he can be expected to identify himself with the interests of the corporation rather than those of the other parties." (Footnotes omitted.)

Here the district court did make the determination on an ad hoc basis and it appears clear to me that any other determination would have unduly liberalized the interpretation of Rule 43(b).

When the matter first came before the court he sustained the objection to the applicability of 43(b). The witness then proceeded to testify and stated that the psychiatric ward was one of the wards under his jurisdiction but that there were approximately 14 wards under his jurisdiction and that he was the night supervisor of the entire hospital. The court then indicated that he would permit the examination under 43(b). Further objection and colloquy, however, developed that Royal was just a night supervisor of nurses and did not supervise all the hospital facilities as night

supervisor and that there was an associate or assistant director of nurses who apparently was superior to Royal. On being so apprised the court adhered to its original ruling.

If a party desires to take the advantage of treating an employee of the opposing party as an adverse witness, the duty clearly should be upon the party calling the witness to establish a clear foundation bringing into play the rule. Here, in my opinion, the proponent failed to do so.

However, even if the district court's ruling was so obviously incorrect as to be erroneous, which I do not find it was, then nevertheless it is not grounds for reversal unless it constitutes harmful error. In the facts of Skogen v. Dow Chemical Co., *supra,* relied upon by plaintiff and by the majority opinion, the court there found on the particular facts before it that the error was harmless since it was not inconsistent with substantial justice and did not affect the substantial rights of the parties.

Applying those tests here it is first of all to be noted that several colloquies between the court and counsel demonstrated conclusively that Royal had no independent knowledge that the belt belonged to the plaintiff but that he based his statement upon the record entry of the nurse and that the matter of Royal's stating that the belt was that of the patient was hearsay and would under any circumstances have been excluded from evidence for that reason.

Even more basic here, however, is the fact that the underlying assumption of the majority opinion seems to be that if the court had permitted Royal to be treated as an adverse witness this would have fortified the plaintiff's case of proving that the decedent had hanged himself with his own belt. On the contrary if the court had permitted the 43(b) treatment, the most that could have happened would have been that plaintiff would then have been permitted to attempt the impeachment of Royal by his own contrary statements. This, of course, would have opened the door to the explanation that while he had made the statement he had based it upon what somebody else had told him and not because of his knowledge. Further, the testimony of the policeman that Royal had made the statement also would have been permissible under these circumstances only for the purpose of impeaching Royal's credibility.

Evidence introduced for purposes of impeachment is not affirmative evidence. Marmo v. Chicago, Rock Island & Pacific R. R. Co., 350 F.2d 236, 239 (7th Cir. 1965). The evidence cannot be utilized for any purpose other than an impeachment and since it goes only to the credibility of a witness it cannot be given any force as evidence in proof or disproof of a disputed fact. Sickles v. Graybar Electric Co., 219 F.2d 847, 851 (7th Cir. 1955), cert. denied, 350 U.S. 827, 76 S.Ct. 57, 100 L.Ed. 739.

Thus it appears to me that if Rule 43 (b) had been found applicable there would have been nothing therein which would have been legally permissible advancement to the proof of plaintiff's contention that the belt was that of the decedent.

The majority opinion next finds reversible error in the district court not permitting Dr. Zaldivar to testify. The trial judge has the supervision of the trial and it is a salutary rule that as a part of that supervisory power, the judge should be permitted to exclude from the witness stand a person whose name has been withheld during discovery procedures. While the Federal Rules of Civil Procedure are designed to facilitate the quest for truth, less than full disclosure during discovery procedures would thwart the quest and should be answered in the manner the court here did. The very purpose of the discovery procedure is to eliminate the surprise element from the trial of the lawsuit and to permit the parties to know in advance of trial that with which they are to be confronted.

Here, counsel for defendant chanced upon the doctor in the hallway less than

an hour before he was to go on the witness stand and had no prior knowledge that he was to be a witness.

It appears to me from the record that there is more than ample basis for supporting a conclusion on the part of the trial judge that plaintiff considered Dr. Zaldivar to be a key witness and that the name intentionally had been withheld from the answer to interrogatory. Two doctors were listed plus "an unknown doctor on Michigan Avenue." The court inquired of counsel for the plaintiff whether the unknown doctor on Michigan Avenue was Dr. Zaldivar and the court was told he was not.

The representations of counsel to the court with regard to this matter are at best ambiguous. At first it was stated, "[b]y oversight, the doctor's name was not included." Subsequently in the continuing colloquy, and the judge gave the matter very careful and close attention "and listened out" the counsel, plaintiff's attorney stated that at the time the answers to interrogatories were prepared they did not have the records of Loretto Hospital and did not have the name of the doctor. It appeared, however, that the answers were filed less than one year before the time that the discussion in the court took place. It is significant that plaintiff's counsel stated in the record that defendant's counsel had had the hospital records "more than a year and a half ago."

This awareness would seem to indicate that plaintiff's counsel also must have had these records and their contention that at the time the answers to interrogatories were prepared they did not have the name of the doctor is rather feeble. Further, they knew how to answer the interrogatories to protect themselves with regard to a doctor whose name was not known by listing the unknown doctor on Michigan Avenue. The court attempted to elicit from them without any satisfactory response why they did not just call the hospital and put this name in the answer to the interrogatory.

The majority opinion indicates that there was no prejudice suffered by defendant in that the defendant had not subpoenaed nor deposed any of the other doctors listed by the plaintiff in the answer to the interrogatory question. However, the record indicates that defense counsel had in fact obtained the "records" of the other doctors who had been listed in the answers to the interrogatories. He did not have this opportunity with regard to Dr. Zaldivar.

Finally, and a basis in and of itself for disposing of this particular matter, is that the announced purpose of putting Dr. Zaldivar on the stand was on the question of damages. Another expert witness called by the plaintiff testified that people in the decedent's condition often recovered and lived a long life. Examination of the final argument of counsel reflects that this testimony was indeed offered as asserted by counsel for the plaintiff with regard to Dr. Zaldivar's testimony to be on the matter of damages only and not on liability. Evidence offered to prove damages would have no materiality until liability has been established. Therefore, there could have been no prejudice on the question of liability and that is all that is before the court at this time.

The majority opinion indicates that Dr. Zaldivar's testimony was important to the question whether the hospital breached its duty of reasonable care. As far as I can see this theory was not proposed by the plaintiff until the reply brief in this court. This belated adoption of a theory should not now be the basis of a reversal. The trial court inquired as to the purposes for introducing the testimony and was informed that it was only on damages and the entire extended colloquy pertained to an examination of that subject. If plaintiff had had some idea that this testimony would have furthered the plaintiff's case on liability the claim should not be presented for the first time on appeal but should have been brought to the attention of the trial court.

Even in the reply brief plaintiff concedes that "[i]t is true that lawyers would refer to the importance of Dr. Zaldivar's testimony as relating mainly to the issue of damages."

Dr. Zaldivar had last seen decedent about six months previous to the trial. The fact that he would have testified that the decedent had responded to treatment and was discharged with advice for further psychiatric care does not, it appears to me, tend to negate the fact that a person with chronic suicidal tendencies will inevitably commit suicide and certainly does not reflect upon whether this hospital in fact breached its duty of reasonable care. In the plaintiff's reply brief, plaintiff attempted to show prejudice in the light of defense counsel's argument that some people will kill themselves no matter what you do. I find, however, that this statement of the counsel was in the context of referring to the testimony of Dr. Arieff, a psychiatric expert called by plaintiff, who did specifically testify that there are cases of people with acute depression who are determined to commit suicide and will "commit suicide no matter what."

The majority opinion next finds reversible error in the argument of counsel with regard to the decedent having voluntarily committed suicide.

Counsel for defendant had stated to the jury that he wanted to talk about proximate cause.

Because a statement made in the argument was deemed to be of sufficient consequence to be grounds for reversal, it is worthwhile to look at that portion of the argument where the challenged statement appears, which reads as follows:

"You have heard testimony here about his prior condition. You have heard testimony here about the fact that he was cooperative, well oriented while in the hospital, no problem, took his medicine, went to bed, went to sleep. That is certainly, to my mind,

ladies and gentlemen—does not indicate a man who was in any acute distress, at least from outward appearances. That is the evidence that we have here. That is the evidence here.

"But you are to say no, it is not possible at all under those circumstances, even though he was cooperative and well oriented; it is not possible at all that, God knows why, but for some reason Mr. Pietrucha's life became unendurable to him, or intolerable to him, and he took his own life. You can't think that way because it is all Grant Hospital's fault, not his.

"But you heard the evidence regarding his physical condition, and how he acted when he arrived at that hospital, and how he acted while there before he did in fact commit suicide. I submit, ladies and gentlemen, proximate cause—where is the relationship? The only evidence we have is what you have heard.

"What was his mental condition at the time? No one knows. You didn't hear any testimony, not even a hypothetical question as to whether or not when that man committed suicide he didn't know what he was doing, that he couldn't control himself.

"MR. TYKSINSKI: Objection, your Honor. That is not the issue in this case.

"THE COURT: No, he may argue his case.

"MR. BRIDGMAN: It sure is. That he didn't voluntarily decide for some unknown reason to commit suicide. If that's the case, then you will be instructed on the law. If that's the case, if he voluntarily committed suicide predicated upon what you have heard from this evidence, then my client is not responsible under any circumstances at all.

"That's what we mean by this proximate cause, this relationship be-

tween what he himself did and what happened, what my client is charged with doing and what happened.

"I submit there has been no proof along those lines regarding his mental condition at that time. On the contrary, on the contrary, we see a two-way street here. We hear the argument on the one hand, that, well, he committed suicide because your client blew it, because your client was negligent. That's why he committed suicide. He didn't do it voluntarily."

Although the majority. opinion states that the quoted portion of the argument pertaining to defendant's client "not [being] responsible under any circumstances at all" was "over objection," it will be noted that no objection whatsoever was lodged to this statement and only a general objection was made prior thereto.

"It is a well established rule that objections to the closing argument not made in the trial court cannot be considered for the first time on appeal." Rothschild v. Drake Hotel, Inc., 397 F. 2d 419, 425 (7th Cir. 1968); Christian v. Hertz Corp., 313 F.2d 174, 175 (7th Cir. 1963).

The only objection opposed during this portion of the argument was to the paragraph about decedent's mental condition and that there was no testimony as to whether he knew what he was doing when he committed suicide. This would seem to be a true statement and the court overruled the objection.

A further reason appears in the record, however, for not finding this portion of the argument to be reversible error.

The court gave plaintiff's tendered instruction No. 10 over the objection of the defendant. This instruction reads as follows:

"Under our law, the plaintiff may attempt to prove in either of two ways that the defendant was negligent. She may prove either what the defend-

ant actually did or did not do, or, on the other hand, she may attempt to prove the following propositions:

"First, that the death occurred while Albert Pietrucha was exclusively under the physical care and control of the defendant, Grant Hospital, in its psychiatric ward and while he was a patient therein.

"*Second, that any voluntary action or contribution on the part of the decedent was not the responsible cause of his death.* (Emphasis supplied.)

"Third, that in the normal course of events, the death would not have occurred if the defendants had used ordinary care while Albert Pietrucha was under its care and control.

"If you find that each of these propositions has been proved, the law permits you to infer from them that the defendant was negligent with respect to Albert Pietrucha while he was under defendant's control and care. If you do draw such an inference your verdict must be for the plaintiff if the death proximately resulted. But if, on the other hand, you find that any of these propositions has not been proved, or if you find that the defendant used ordinary care for the safety of Albert Pietrucha as his known mental condition required then your verdict should be for the defendant."

Thus it appears that in the desire to proceed in part on a *res ipsa loquitur* theory, the plaintiff herself interjected reference to voluntary action or contribution on the part of the decedent. The plaintiff herself made an element of recovery under *res ipsa loquitur* the lack of voluntary action on the part of the decedent being responsible for the cause of the death. The majority opinion finds no basis for any consideration of voluntary self-destruction stating that there was no evidence that the decedent was lucid at the time he committed suicide and therefore defense counsel's argument

was improper. However, this ignores counsel's recounting testimony to the effect that the decedent was cooperative and well-oriented while in the hospital. Apparently without problems he took his medicine, went to bed and went to sleep. This may have been slim evidence but with the element of voluntariness having been introduced by plaintiff's own tendered instruction, I cannot find any basis for saying that this created such an unfair atmosphere as to preclude a fair trial.

Counsel should not be permitted to misstate the law but looking at this argument as a whole, while it perhaps is no model exposition of the applicable law, it nevertheless does not appear to me to be such a misstatement as to require this case to be sent back for a new trial.

Finally, the majority opinion refers to the district court rejecting plaintiff's Instruction No. 17. This instruction reads as follows:

"That where defendant, Grant Hospital, having accepted Albert Pietrucha as a patient, knew or is warned of a patient's suicidal tendencies, it is required not only to use reasonable care in treating the patient for his illness, but also to safeguard him from his self-inflicted injury or death. This duty is proportionate to the patient's needs, that is, such reasonable care and attention as the patient's known mental condition requires."

The court did give plaintiff's Instruction No. 11 which reads as follows:

"It was the duty of the defendant before and at the time of the occurrence, to reasonably safeguard and protect plaintiff's decedent. This duty is proportionate to the plaintiff's need, that is, such reasonable care and attention as his known mental condition required."

While the majority opinion does not so state, the two instructions would seem to be duplicitous and I would know no reason that the plaintiff was entitled to both. Indeed, in the discussion of instructions the plaintiff's attorney referred to Instruction No. 17 as an alternative instruction and that the court had already indicated he would give an instruction as to the duty of the hospital, referring to Instruction No. 11. There was here no objection to the court with regard to the refusal to give Instruction No. 17 as required by Rule 51, Fed.R. Civ.P.

In the discussion of Instruction No. 17 the majority opinion does not state that failure to give this instruction was reversible error but purports rather to lay down guidelines for the new trial. On the other hand in the final paragraph of the majority opinion, one of the grounds for reversal is given as the error in instructing the jury so that presumably reference is made to Instruction No. 17. If the indicated error in instructions is because of the voluntariness issue this, of course, as indicated hereinbefore was introduced in the plaintiff's own instruction and should certainly not be the basis for reversal.

Insofar as 17 itself is concerned, it is clear that the failure to particularize grounds of objection so as to give the trial court an opportunity of correcting the instruction if erroneous precludes review on appeal. Holliday v. Great Atlantic & Pacific Tea Co., 256 F.2d 297, 301–302 (8th Cir. 1958); Sulentich v. Interlake S.S. Co., 257 F.2d 316, 320 (7th Cir. 1958), cert. denied, 358 U.S. 885, 79 S.Ct. 125, 3 L.Ed.2d 113.

In my opinion, this case was fairly tried and the plaintiff is not in a position now to claim reversible error. Therefore, I would affirm the judgment below.