**WALTON et al. v. SHERWIN–WILLIAMS CO. et al.**

No. 14240.

United States Court of Appeals Eighth Circuit.

Aug. 15, 1951.

---

C. M. Erwin and Mr. Kaneaster Hodges, Newport, Ark. (Barber, Henry & Thurman, Little Rock, Ark., on the brief), for appellants.

James I. Teague, Little Rock, Ark. (Wesley H. Bengel Newport, Ark., and McMillen & Teague, Little Rock, Ark., on the brief), for appellees.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

## WOODROUGH, Circuit Judge.

The nine actions consolidated for the trial which resulted in the judgment of dismissal here appealed from were severally brought by farmers engaged in raising cotton in Jackson County, Arkansas. Their growing cotton was damaged in the summer of 1947 by the spray of a weed killer (dichlorophenoxyacetic acid) commonly known as 2,4-D, marketed in this instance under the trade name of Weed-No-More, which neighboring rice farmers had mixed in an oil solution and were causing to be spread by airplane over their rice fields to kill out the broad-leafed weeds.[1] It is characteristic of the 2,4-D, that it kills broad-leafed plants like and including cotton and broad-leafed weeds in the rice fields but is innocuous to the narrow-leafed rice plant. In the spraying of the rice fields the chemical reached the fields of cotton belonging to the several plaintiffs and caused very substantial damage to that crop.

The cotton farmers brought their respective actions for the recovery of their damages against the manufacturer of the Weed-No-More, Sherwin-Williams Company of Ohio as defendant, without including any of the persons who did the spraying or who caused it to be done. Two wholesale and retail distributors of Weed-No-More were originally included as defendants but on the trial of the consolidated cases it appeared to the court that no case was made out for the jury against the distributors and they were peremptorily dismissed and no error is asserted here as to that action of the court. Reversal is sought of the judgment dismissing the actions against the manufacturer.

In their complaints against the manufacturer the plaintiffs alleged that the defendant well knew that its product Weed-No-More would be sold as it was to be used to spray rice fields by airplane in "areas of mixed crops"[2] and that when so sprayed it had a tendency to drift from the place where it was released and to settle on sensitive crops in the area to their injury, and that its drifting tendency rendered its use dangerous and unsafe in areas of mixed crops, and that such danger and unfitness was as defendant knew inherent in the Weed-No-More. It was also alleged that the manufacturer was negligent in failing to use ordinary care to make adequate tests to determine whether or not its product was inherently dangerous as alleged and also in failing to use reasonable care to give adequate instructions and directions as to the preparation and use of Weed-No-More. Judgments for damages were prayed for.

The manufacturer admitting that it manufactured and sold the Weed-No-More, denied any negligence on its part and denied that its product in oil solution was inherently dangerous for use in spraying rice fields from an airplane in an area of mixed crops. It denied that negligence on its part, if any there was, was the proximate cause of plaintiffs' damage. It alleged that Weed-No-More could be safely used in areas of mixed crops provided ordinary care was taken in selecting the rice fields to be sprayed, in choosing the time for the spraying, in operating the plane,

---

1. One of the farmers used water in place of oil.

2. "An area devoted to cultivation of rice and also devoted to the cultivation of broad leafed crops liable to be damaged by 2,4-D."

and in observing the factors of wind velocity and direction, the temperature, and the height of the airplane from the ground. Defendant alleged that it had used reasonable care to make adequate tests of the qualities and properties of its product and that the warnings and instructions given by it were adequate to prevent damage to other crops where it was being sprayed by airplane in an area of mixed crops. It also alleged that the damage to the cotton crops of the plaintiffs was caused by negligence on the part of the farmers or the airplane pilot in failing to exercise ordinary care in the application of the Weed-No-More to the rice fields. That the pilots who sprayed the rice fields involved had wide experience in using 2,4-D preparations and knew its properties and knew how and when to spray it in such manner as to eliminate the probability of damage to broad leafed plants like and including cotton growing in the vicinity of the rice to be sprayed. It prayed for dismissal of the actions.

It appeared to the trial court that as the actions were brought they presented occasion appropriate for submission to the jury of special interrogatories as provided in Rule 49(a), F.R.C.P., 28 U.S.C.A., and after all the evidence had been taken the court instructed the jury on the applicable law and formulated and submitted special interrogatories which covered the fact issues raised by the pleadings and evidence. The instructions and interrogatories are reported in full in 10 F.R.D. 293.

When the interrogatories and the answers which the jury gave to them are read in the light of the relevant instructions of the court, it appears that the jury found and declared the facts to be:

That the damage to the cotton crops of plaintiffs was caused by Weed-No-More being sprayed in oil solution by airplane over rice fields coming in contact with the cotton plants. That the defendant knew or should have known that its product would be used in oil solution for spraying over rice fields in areas of mixed crops and it used reasonable care to make adequate tests to determine the qualities and properties of the product and did not fail to give adequate warnings and instructions regarding its use. That it was not shown by preponderance of the evidence that the Weed-No-More mixed in oil solution for spraying by airplane over rice fields in an area of mixed crops is an inherently dangerous product the use of which for its intended purpose necessarily involves a risk of serious harm to the property of others regardless of the degree of care which is used in its preparation and spraying. That either the rice farmers or the airplane pilot knew or in the exercise of ordinary care should have known that Weed-No-More would damage or destroy cotton if it came in contact with it. That either the rice farmers or the airplane pilot was guilty of negligence in failing to use ordinary care to so spray it that it would not come into contact with crops of the plaintiffs.

The jury also found the amount in dollars of the damage done to each plaintiff's cotton.

When the findings of the jury were returned the court directed that judgment be entered thereon and dismissed the actions on the merits at plaintiffs' costs.

Accompanying its denial of a motion by plaintiffs for judgment notwithstanding the verdict and in the alternative for new trial, the court filed its memorandum in writing in which it observed that "conflicting evidence was introduced to support the respective theories of both plaintiffs and defendants and that this conflicting evidence raised questions of fact to be decided by the jury. The jury's findings are in my opinion supported by substantial evidence and should not be disturbed."

Responding to contentions made for the plaintiffs in respect to the decision of the Supreme Court of Arkansas in Chapman Chemical Co. v. Taylor, 215 Ark. 630, 222 S.W.2d 820, upon which they mainly relied in the trial court as they do in this court, Judge Lemley said:

"In connection with the Chapman Chemical Company case, we do not agree with plaintiffs that this case goes so far as to hold that as a matter of law all products containing 2,4-D are so inherently dangerous as to impose strict liability upon the

manufacturers or dealers for all damages which may be sustained by the property of others. The Supreme Court of Arkansas was concerned in the Chapman case with 2,4-D in dust form, the carrying agent being a form of 'talc'. The Court stated in that case, and the evidence in the instant case introduced by both sides indicates, that 2,4-D in dust form will drift for great distances and will damage susceptible crops many miles from the point at which the substance is released into the air. The Chapman Chemical Company put its product on the market as its own (thus assuming a manufacturer's liability) without making any tests whatsoever to determine its drifting qualities. Under such circumstances the Supreme Court held that 2,4-D in dust form was an inherently dangerous product and its application from an aircraft was an ultra-hazardous activity which imposed strict liability upon the company, and that the company was not excused from liability merely because it did not know what the dust would do when released into the air; it was said that the company was charged with such knowledge as tests would have revealed. The Court in the Chapman case was concerned with a product which was likely to produce serious injury to the property of others regardless of the degree of care employed in its use.

"The situation here is quite different; in the instant case the preparation manufactured and sold by the defendants was to be applied as a liquid spray, and there was substantial evidence that such a preparation can be used safely in an area of mixed crops if certain precautions are taken and if certain control factors are observed, for example the evidence to the effect that when the rice crop of P. W. Black, Jr., one of the plaintiffs herein, was sprayed, his own cotton, growing immediately adjacent to his rice, was not at all damaged. Moreover, bulletins prepared by expert witnesses for the plaintiffs in connection with their work in the Extension Service of Louisiana State University point out a distinct difference between dust preparations of 2,4-D and liquid preparations.

"Conceding that the holding in the Chapman case is to the effect that 2,4-D in dust form is so inherently dangerous when sprayed from an airplane as to impose 'absolute liability' on the manufacturer, it does not follow that 2,4-D in liquid form is such an inherently dangerous product. It is to be borne in mind in this connection that the evidence in this case shows that 2,4-D standing alone has no peculiar drifting qualities; such qualities depend upon the carrier which is employed. In the Chapman case that carrier was a powder; in this case it was a liquid."

On this appeal it is contended for appellants (1) that the trial court erred in not holding 2,4-D to be an inherently dangerous product to which the rule of strict liability was applicable under the law of Arkansas, and in refusing a peremptory instruction for the plaintiffs; (2) that the court erred in submitting to the jury the interrogatory whether the farmers or the aircraft pilot knew or should have known that Weed-No-More would damage or destroy cotton if it came in contact with it; (3) that the court erred in inquiring whether the jury found from a preponderance of the evidence that the farmers or the aircraft pilot were negligent in failing to use ordinary care to properly prepare the Weed-No-More for spraying or in failing to use ordinary care to so spray it that it would not come into contact with crops of plaintiffs; (4) that the court erred in submitting to the jury the question of adequacy of tests made by the manufacturer; (5) that the court erred in the admission and in the exclusion of testimony.

(1) It clearly was the endeavor of the cotton farmer plaintiffs in these actions to assimilate their cases to the Arkansas case of Chapman Chemical Co. v. Taylor, supra, and to obtain judgment against the manufacturer of the Weed-No-More on the grounds upon which the Arkansas court sustained judgment in favor of the cotton farmers and against the manufacturer of the 2,4-D weed killer compound spread on the rice field that did the damage in that case, but we think that Judge Lemley properly distinguished between the cases and

was not in error in submitting to the jury the issue as to the character of Weed-No-More in oil solution used in this case. There was substantial evidence that it has become almost standard practice to use it in oil solution in the way that it was used here and that if ordinary care is taken it does not harm other crops in the vicinity.

Plaintiffs adduced the testimony of three expert witnesses and sought to prove that 2,4-D is an inherently dangerous product without regard to the form of the mixture or solution it is put in. Examination and cross-examination of these witnesses (Dr. C. M. Meadows, Dr. Clair Brown, and Dr. T. C. Ryker), however, brought out the facts as to the distinct differences between 2,4-D in dust form and in spray form. All these experts testified to the dangers of using the dust form because of the great distances the 2,4-D dust would drift. All testified that the liquid form could be controlled if the various safety factors (wind velocity, particle size of spray, height of the airplane, etc.) were carefully observed.

It is particularly striking to note the testimony of two of these witnesses as to the fact that 2,4-D spraying today is the usual procedure in controlling weeds. Dr. Meadows testified: "The spraying of 2,4-D over the past three years is widely used practice almost a standard form of operation. * * * This year [1950, when the witness was testifying] it is a common and accepted practice that weed control be done. There is no difference today in the method of spraying than in 1947, that is, in the method of application. The height that was recommended to fly then, and the dosage we recommended then and solution, is being used very successfully today."

Dr. T. C. Ryker, a plant pathologist, testified: "Whether or not it is proper to apply 2,4-D to a given field at a given time depends on the discretion of the person making the decision and upon the condition of the equipment and the skill of the pilot in making the application and it is a fact that there are literally thousands of acres that are sprayed safely every year."

The testimony of these expert witnesses alone gives substantial support to the jury's finding that 2,4-D in an oil solution is not inherently dangerous. Other evidence was to the same effect. E. E. Terry, the owner of the airplane company which furnished the pilot and plane for the applications of Weed-No-More in this case, testified that 2,4-D could be sprayed safely.

If a substance can be used safely by observing certain precautions in the use, and those precautions are known to the persons using the substance, then the manufacturer of it can not be held to "strict liability" for damage resulting from negligent use of it. The substance is not inherently dangerous. There was substantial evidence, if believed, to support a finding by the jury that 2,4-D can be, and is, safely applied. Further, there was evidence from which it was a fair inference that the precautions necessary for the safe application of 2,4-D were known to the pilot in the present case. The jury so found. There is equally solid foundation for the finding that 2,4-D in an oil solution is not an inherently dangerous product.

There was sufficient evidence to submit the issue to the jury and the court did not err in refusing to rule that 2,4-D in oil solution is an inherently dangerous product, or in refusing to give a peremptory instruction to the jury in plaintiffs' favor.

(2) Appellants urge that the giving of Interrogatory No. 7 was error. This interrogatory was: "Do you find from a preponderance of the evidence that either the rice farmers or the airplane pilot knew, or by the exercise of ordinary care should have known, that Weed-No-More would damage or destroy cotton if it came in contact with it?" The question was answered in the affirmative, and now the appellants contend that the submission of the interrogatory was error.

Appellants do not contend that there was not evidence to support such a finding, but have made only a general objection to the submission of the interrogatory. No reason is set out why it was error to submit this particular question, and we

find none. The issue as to whether the rice farmers and the pilot knew what the damaging effect of 2,4-D might be was raised by the pleadings. Plaintiffs alleged the properties of Weed-No-More were not likely to be known or understood by those using it, while defendants in their answer alleged that the labels on the containers of the herbicide were adequate to inform the purchasing public of what the Weed-No-More would do. The inquiries upon the issue joined were certainly relevant and not prejudicial to plaintiffs' rights.

(3) Appellants further contend that the submission of Interrogatory No. 8 was error. This interrogatory was: "If you have answered Interrogatory No. 7 in the affirmative, state whether or not you find from a preponderance of the evidence that either the rice farmers or the airplane pilot was guilty of negligence in failing to use ordinary care to properly prepare the Weed-No-More for spraying or in failing to use ordinary care to so spray the Weed-No-More that it would not come in contact with crops of the plaintiffs, or in both of these respects."

Appellants urge as grounds of alleged error in submitting the interrogatory that: 1) Submission of any interrogatory as to the negligence of the rice farmers or the pilot was prejudicial and erroneous; 2) that there was not sufficient evidence to support a finding that there was any negligence on the part of either the pilot or the farmers, and the interrogatory should not have been submitted for that reason; and 3) that it was error to join the rice farmers and the pilot in the interrogatory.

■ First, the pleadings presented the fact issue as to whether there was negligent use of the Weed-No-More by the farmers or the pilot and the interrogatory was appropriate to settle that issue and was without prejudice.

■ Secondly, the spraying in these cases was done by and at the instance of the rice farmers out in the country and almost inevitably the defendant manufacturer was in no position to adduce direct testimony of specific acts of negligence that caused the damage to the cotton. But there was testimony given by a woman who had been working in a field a quarter of a mile from one of the rice farms being sprayed. She testified that shortly after the airplane made one of its rounds spraying, she felt a burning sensation in her nostrils and felt an oily substance strike her face, and it was fairly to be inferred from her testimony by the jury that the pilot was negligent in his method of applying the herbicide so that the spray would almost immediately strike a woman a quarter of a mile away. But generally the interrogatory was simply supplementary to the main inquiry as to the nature of the product—whether it was inherently dangerous so that damage was to be expected from its use to spray rice fields in mixed crop areas, or whether it could be safely so used if care was taken, and the occurrence of damage to cotton fields gave rise to an inference of negligence in its use. Furthermore, the interrogatory was pertinent to the issue of proximate cause. The finding that the rice farmers or the pilot failed to use ordinary care presents a sufficient and proximate intervening cause of the damage which would afford complete defense to the defendant. Central Flying Service v. Crigger, 215 Ark. 400, 221 S.W. 2d 45; Wisconsin & Arkansas Lumber Co. v. Scott, 153 Ark. 65, 239 S.W. 391; Meeks v. Graysonia, Nashville & Ashdown RR., 168 Ark. 966, 272 S.W. 360.

■■ Thirdly, the joinder of the rice farmers with the pilot of the airplane in the interrogatories was not prejudicial error. Under Arkansas law it has been held specifically that in cases where an airplane pilot in applying sprays does so negligently, his negligence is that of the farmer employing him, and the theory of an independent contractor relationship does not apply. Hammond Ranch Corporation v. Dodson, 199 Ark. 846, 136 S.W.2d 484. There could be nothing prejudicial to appellants in the joinder of the farmers and the pilot in the interrogatories.

■ (4) Appellants contend that the finding of the jury that defendant had made adequate tests as to the properties of Weed-No-More is without foundation in the evi-

dence, and that for that reason it was error to submit Interrogatory No. 5 ("Do you find from a preponderance of the evidence that Sherwin-Williams failed to make adequate tests to determine the qualities and properties of Weed-No-More?"). The record discloses, however, that there was sufficient evidence, if believed by the jury, to show that the defendant made proper tests as to the properties of Weed-No-More, and there was no error in submitting the interrogatory to the jury.

Dr. Charles Meadows, a qualified chemist who had worked for the defendant, stated: "The first of these tests started in the fall and winter of 1946 * * *' We had tests and records showing the distance we killed beans by drift and spray in normal conditions. Yes, we actually made tests to determine the distance this material would damage beans. * * * Beans are the same classification as cotton with reference to susceptibility * * *". Other evidence tended to show that Sherwin-Williams knew that 2,4-D would damage all broad-leafed plants; and also that they knew that 2,4-D in oil solution had no different drifting characteristics than any other oil solution. Such knowledge on the part of defendant certainly would support an inference that tests had been made. There was substantial evidence to support the jury's finding, and there was no error in submitting the interrogatory.

(5) The other specifications of error relied on by appellants relate to the admission and exclusion of evidence. Appellants first urge that there was error in the admission of testimony on behalf of appellee with regard to safe sprayings of 2,4-D made by a pilot after the date of the sprayings complained of in this case. Appellee called an experienced airplane pilot to testify as to the methods used in applying insecticides and herbicides in spray form from airplanes. In qualifying this witness as an expert in airplane spraying, counsel for appellee asked him, "How many acres did you spray in 1948?" and "How many in 1949?" A general objection was interposed to these questions, and after appellee pointed out that the witness was just being qualified as an expert, the court overruled the objections. Clearly this was not error. It has never been suggested that an expert witness must have acquired the special knowledge or experience which he is to present to the jury at a time before the date of the occurrence of the event which is in issue before the jury. In the present case it was clearly pointed out to the court that the question was asked for the purpose of qualifying the witness. For such a purpose it was clearly admissible within the sound discretion of the trial court.

The other allegation of error with regard to the exclusion of evidence rests on the exclusion of testimony of Dr. Brown and Dr. Ryker of Louisiana State University and of Mr. Paul Miller, chief inspector of the Arkansas Plant Board. Drs. Brown and Ryker were qualified as experts for the appellants and testified extensively on the subject of 2,4-D in its various forms as to its physical qualities and characteristics. These two witnesses were then asked if in their expert opinion the label which was on the containers of Weed-No-More conveyed an adequate warning to those who would use it commercially. These questions and the answers thereto were excluded on the objection of defendant, the court ruling that "the questions invade the province of the jury."

Admittedly the general rule against witnesses testifying to the ultimate fact before the jury has been relaxed to the extent that it is now the view that an expert witness may testify to such a fact if it is one within the field of his peculiar and special knowledge. It has been stated that the rule is that an opinion of an expert as to an ultimate jury fact is admissible if the jury is unable to judge the fact as well as the expert. See U. S. Smelting Co. v. Parry, 8 Cir., 166 F. 407; Cropper v. Titanium Pigment Co., 8 Cir., 47 F.2d 1038, 78 A.L.R 737; Woelfle v. Connecticut Mutual Life Insurance Co., 8 Cir., 103 F.2d 417. However, to come within this exception the witness must be testifying to something peculiarly within his knowledge and peculiarly without the knowledge of

the jury. The mere fact that the witnesses here were experts in their fields of botany and plant pathology does not qualify them to speak with authority on the effectiveness of a label in conveying a warning. The test as to whether or not a label is adequate is whether the ordinary prudent man can understand it, assuming of course that the label does not give false information. Fredendall v. Abraham & Straus, 279 N.Y. 146, 18 N.E.2d 11; McClaren v. G. S. Robins & Co., 349 Mo. 653, 162 S.W.2d 856; Bender v. William Cooper & Nephews, Inc., 323 Ill.App. 96, 55 N.E.2d 94. The question asked of these experts was not only one of ultimate fact, but a question that a jury is particularly fitted to answer. The question in the case was not whether the labels conveyed adequate warning to experts such as the witnesses, but whether the ordinarily prudent man would be warned.

The statement made by Judge Lemley appears to be in accord with Arkansas law:

"Relative to the portions of the depositions of Dr. Brown and Dr. Ryker which were excluded, these portions of their depositions involved an expression by them of their respective opinions that the labels on the containers of Weed-No-More were inadequate. All of the rest of their depositions were admitted; in the portions which were admitted these two witnesses, one of whom is a plant pathologist and the other an entomologist, testified in great detail as to the properties of 2,4-D in its various forms. They told what crops it would damage and how far it would drift under various conditions; they also discussed the alleged vaporizing or fuming properties of the chemical and the damages which, in their opinion, were to be expected from such properties. Each was then asked to say whether or not in his opinion the warnings and directions contained on the labels were adequate, and it was these questions and the answers thereto which were excluded by the Court.

"I am convinced that there was no error in excluding these particular questions and answers. In the first place the questions called for opinions of the witnesses on one of the ultimate questions in the case; they invaded the province of the jury on a question which the jury was entirely capable of answering without the benefit of their expert opinion, were we to assume that these witnesses had qualified as experts on the adequacy of labelling. The jury had heard in great detail from these witnesses and from others all about the properties of 2,4-D in its various forms and combinations; they had heard what crops it would injure and how it would injure them; they had heard much testimony about how far various 2,4-D preparations would drift under various conditions, and they had the labels before them. The members of the jury could examine those labels and consider them in the light of the testimony which they had heard, and they could say for themselves whether or not the warnings and directions were sufficiently adequate to apprise a person of reasonable understanding of the dangers to be expected from the use of Weed-No-More and of the conditions and methods of safe use.

"Authorities cited by counsel for the plaintiffs are to the effect that an opinion of an expert witness on an ultimate issue of the case is admissible in evidence where the matter under consideration is beyond the scope of lay experience and knowledge and the members of the jury are incapable of correctly resolving the issue without the expression of the opinion. Such, however, is not the case here. As stated, I feel that the members of this jury were entirely competent to determine the adequacy of the directions and warnings contained on the labelling without any expression of opinions on the subject from Drs. Ryker and Brown. Moreover, the question on the admissibility of opinion evidence on an ultimate question in a case rests largely within the discretion of the trial court.

"Further, I do not feel that these two witnesses were qualified to express an opinion as to the adequacy of warnings and directions. Both were qualified to express opinions as to the qualities and characteristics of the 2,4-D preparations and as to the conditions under which they should be used, but the adequacy of a set of warnings

or directions is not a scientific matter. Whether or not a given warning is adequate depends upon the language used and the impression that it is calculated to make upon the mind of an average user of the product. Questions of display, syntax, and emphasis are involved in evaluating a warning, or set of directions, and upon those matters plant pathologists and entomologists are not necessarily qualified to speak. To illustrate this statement, throughout the trial the plaintiffs laid stress upon the fact that the labels did not specifically mention cotton as one of the crops that 2,4-D would damage, while the defendants contended that the phrase 'and many other broad leafed plants', following a list of specific crops, would put a reasonable man on notice that cotton would be damaged because it is generally known that it is a broad leafed plant. Now this is certainly not a question to be decided by the expert opinions of scientists, but is purely a question of the meaning of words in the English language and the construction which would be placed upon them by persons in the position of rice farmers and airplane pilots of reasonable intelligence."

The same reasoning applies to excluded answers of Mr. Paul Miller to the same line of questioning. Miller was the chief inspector of the Arkansas Plant Board. In 1948 all 2,4-D in the State of Arkansas was impounded by the Plant Board and the Board ordered that the labelling on each container be changed to conform with the directions of the Plant Board. All of Miller's testimony with regard to these facts was excluded and we believe rightfully so. As the trial court said in its memorandum rendered in overruling plaintiffs' motion for a new trial:

"Neither Mr. Miller nor any of his subordinates claimed to have any expert knowledge of 2,4-D or to have conducted any experiments with it. They formed their ideas about the labelling entirely from information received from other sources and from their interpretation of the labels which were in use.

"* * * the mere fact that the Inspectors of the Board deemed the labelling inadequate under the circumstances outlined above and, without notice or hearing, placed quantities of Weed-No-More under quarantine, was without probative value in establishing that the labels were in fact inadequate, and I felt that the admission of Mr. Miller's deposition and the exhibits attached thereto would be highly prejudicial to the defendants."

On consideration of the entire record no error has been found and the judgment is affirmed.