Harold N. SKOGEN, David Skogen, a Minor, by Harold N. Skogen, His Father and Natural Guardian, and Douglas Skogen, a Minor, by Harold N. Skogen, His Father and Natural Guardian, Appellants,

v.

The DOW CHEMICAL COMPANY, a Corporation, and Ralston Purina Company, a Corporation, Jointly and Severally.

No. 18452.

United States Court of Appeals
Eighth Circuit.

March 30, 1967.

Stewart R. Perry, Minneapolis, Minn., for appellants, Walter E. Riordan, Minneapolis, Minn., with him on the brief. the brief.

Donald M. Jardine, of Tyrrell, Jardine, Logan & O'Brien, St. Paul, Minn., for appellee, The Dow Chemical Co., Michael J. Healey, St. Paul, Minn., with him on the brief.

Francis W. Van Eps, of Robb, Robb & Van Eps, Minneapolis, Minn., for appellee, Ralston Purina Co., Raymond W. Fitch, Minneapolis, Minn., with him on the brief.

Before VAN OOSTERHOUT, GIBSON and HEANEY, Circuit Judges.

GIBSON, Circuit Judge.

This is a product liability case concerning the use of an insecticide, Purina Spray and Dip. The jury, in answering a special interrogatory, found no causal connection between the exposure to the insecticide and the severe and permanent injuries suffered by the minor plaintiffs. The Court entered judgment for defendants based upon the special interrogatory to the jury, and the plaintiffs filed a timely appeal.

Plaintiff Harold Skogen initiated this action individually and on behalf of his minor sons, Douglas and David Skogen, ages 13 and 16 respectively. Defendant Ralston Purina Company is engaged in the manufacture and sale of feed and farm products, including insecticides. One of these insecticides is Purina Spray and Dip, which as a primary ingredient contains a chemical known as Ronnel.[1] Ronnel was developed about 1947 by defendant Dow Chemical Company who subsequently manufactured and marketed the product Ronnel to the trade. The particular Ronnel used in the formulation of the Purina Spray and Dip in question was sold to Purina by Dow under the trade name Korlan-8.

On July 17, 1963, Harold Skogen purchased a half gallon of Purina Spray and Dip. His minor sons, David and Douglas, on the afternoon of the same day used this Purina Spray and Dip to kill flies and other insects in the barn and hog house on their father's farm. The spray was mixed with water and used as directed. The spraying of the barn took about 25 to 30 minutes. Both David and Douglas were exposed to the spray mist and their clothing was damp from settling of the spray. Douglas, in addition, had received some direct spray on his person when he was moving the sprayer about and dragging the hose.

---

1. Purina Spray and Dip is a commercial insecticide formulated by defendant Ralston Purina Company and contains 24 per cent Ronnel, 59.6 per cent Xylene, and 6.4 per cent inert ingredients. Xylene is a solvent and is used as an emulsifier and carrier for Ronnel.

The boys did not change their clothes until retiring that evening. The boys made no complaint before going to bed that night and showed no visible symptoms of skin irritation, respiratory coughing or dizziness, except complaint was made about the odor of the spray.

David, the older boy, had no symptoms on Thursday, July 18, 1963, or at any time thereafter, until mid-August following. Douglas, however, complained the next morning of being nauseated and he became dizzy while driving the tractor that afternoon. On Friday, July 19, Douglas was suffering from chills and was further lethargic. On Saturday, Douglas lay in the house all day and was listless. On Sunday, he started to vomit and his parents took him to the doctor. Dr. Metcalf saw Douglas again on Monday and referred him to the University of Minnesota Hospital. The examination at the hospital on Monday showed Douglas with a fever of 102° coupled with drowsiness. Examination of his eyes was negative. There was no unusual tearing to the eye ducts, no unusual salivation or drolling in the mouth, nor was there any tremor or twitching of his body. His chest was clear, with no inflammation of the lungs. Heart beat was regular and the reflexes were negative. He complained of fever and aching in his arm and leg muscles. On July 22, 1963, his symptoms had increased and he was delirious, but his breathing and respiration were still normal. Dr. Metcalf made a tentative diagnosis of encephalitis. There was some testimony from Harold Skogen that Douglas had a lot of saliva on his mouth on the previous Saturday. This fact, however, was not mentioned in Harold Skogen's pre-trial deposition and his testimony is the only direct evidence of excessive salivation. Dr. Metcalf, the attending physician, never offered any opinion on the causal connection between Purina Spray and Dip and Douglas's condition. Douglas, when he entered the hospital, was placed in the communicable disease section.

As a result of his condition, Douglas suffered substantial brain damage, advanced intellectual deterioration and permanent severe psychotic reaction, requiring custodial care for the remainder of his life.

David Skogen did not notice any illness following the spraying of July 17, 1963. On August 15, 1963, Harold Skogen, David's father, sprayed the barn once again using the Purina Spray and Dip. After the spraying was completed, David entered the barn and worked there for about 45 minutes. Two days later, David began to feel sick. This progressed into chills, malaise and vomiting. He was admitted to the hospital on August 21, 1963. David suffered brain damage which resulted in some personality change, but he did not suffer damage to the extent of his brother Douglas.

Because of the tragic and permanent injuries suffered by the Skogen boys, we have examined in detail the evidence presented on their injuries, the medical diagnosis of their condition and the causal connection, if any, of the insecticide with their condition. As noted by the experienced trial judge, the case presents essentially a factual issue on causation. Since no causation was found, the issues of warranty and negligence and the other defenses urged by the defendants were not reached. This case was extensively and aggressively tried and defended during seventeen trial days, with the jury being called upon to consider voluminous medical and scientific testimony, the medical testimony being directed toward the condition of the boys and their symptoms as either evidencing viral encephalitis or organo-phosphate poisoning. The scientific evidence dealt with the properties of Ronnel, which the defendants admit is, at least, a mild cholinesterase inhibitor, belonging to that class of compounds known as organo-phosphates, while the plaintiffs contend that a chemical phenomenon known as $P=O$ Bond causes the chemical to become highly toxic. This presented initially the basic question of diagnosis

to the jury. Did the Skogen boys suffer from viral encephalitis or a toxic organo-phosphate poisoning arising out of an overexposure to a cholinesterase inhibitor?[2]

In the trial of this case, plaintiff offered evidence indicating that Douglas and David suffered from organo-phosphate poisoning caused by a highly toxic P=O compound in the Purina Spray and Dip. Defendants' evidence indicated that Purina Spray and Dip contained no P=O compound and was of very low toxicity. Furthermore, the evidence of defendants indicated that the Skogen boys suffered from a viral disease known as viral encephalitis and for this reason their condition could have had nothing to do with the exposure to the Purina Spray and Dip.

Plaintiffs do not contend that there was insufficient evidence to support the finding of the jury, as indeed they could not, as the evidence supporting defendants' position appears persuasive. Nor do plaintiffs object to the trial court's application of the law as set forth in the instructions to the jury. Plaintiffs predicate this appeal on numerous objections to the way the trial was conducted.

As a general summary, plaintiffs object to not being allowed to cross-examine two witnesses under Rule 43(b), Fed. R.Civ.P. They object to the allegedly critical remarks and the contempt action taken by the trial court against plaintiff's trial counsel. Plaintiffs contend undue restriction in the cross-examination of numerous witnesses. Plaintiffs object to the admission of various pieces of evidence and to the exclusion of other evidence. Plaintiffs also complain of the conduct of defense counsel. Plaintiffs object to the trial court's refusal to allow rebuttal evidence and the refusal to allow reopening of the case to present additional testimony. Finally, plaintiffs object to certain comments made by the trial court during the final charge to the jury. Numerous as these objections are, we find no reversible error. The judgment of the trial court is affirmed.

To begin, we must note the overwhelming nature of the evidence that supports the jury's verdict. Without going into the maze of technical data, the great weight of the evidence indicated that the chemical Ronnel and Purina Spray and Dip were low in toxicity to humans, though it is an economic poison effective in killing flies and similar insects. Poisoning of the Skogen boys does not appear probable from a chemical of such low toxicity.[3] Secondly,

2. According to the evidence, the enzyme cholinesterase is found in all men and animals. It plays a vital role in the conduction of nervous impulses. If the biological action of the enzyme is interfered with or inhibited, serious consequences can result, causing irreparable damage to the central nervous system.

3. Tests required by the Federal Food and Drug Administration indicate that Ronnel is five times less toxic than any substance which the Food and Drug Administration would classify as highly toxic under the Hazardous Substance Labeling Act. And Ronnel was found to be one thousand times more toxic to flies than to humans. L.D. 50 tests show that Ronnel is low in toxicity as compared with other economic poisons, while it is high in toxicity for pests.

Tests of toxicity are usually conducted on animals by putting the animals in contact with the product, either by ingestion, inhalation, or absorption. L.D.

50 means lethal dose for 50%. It represents that amount of material necessary to kill half of a given number of test animals in accordance with their weight. The amount necessary of the particular product tested is indicated in the test symbolization by a numeral or numerals following the test symbol, as L.D. 50–10 indicates 10 milligrams per kilogram of body weight. This represents that one-half of the test animals fed 10 milligrams of a particular product would die. Therefore, the lower the number the greater the toxicity.

The specific L.D. test on Ronnel shows:

L.D. 50 for rats was 1.74 grams per kilogram of body weight. For guinea pigs, the figure was 3.14 grams per kilogram; rabbits .64 gram per kilogram; mice, 2.14 grams per kilogram; dogs, over .5 gram per kilogram; ducks, over 4.0 grams per kilogram; and chickens, over 5.0. Ronnel was also administered to cattle and to humans. Cattle received

and more importantly overexposure to chemicals causing organo-phosphate poisoning has definite symptoms. Viral encephalitis has definite symptoms which differ markedly from symptoms of organo-phosphate poisoning. The overwhelming weight of the medical evidence indicated that the Skogen boys had all of the symptoms of viral encephalitis, which symptoms would not be found in a case of organo-phosphate poisoning. The conclusion is inescapable that the evidence does not show the boys suffered from organo-phosphate poisoning as they alleged.[4]

Analysis of medical and related evidence persuasively shows that Douglas and David did not suffer from the symptoms that a cholinesterase inhibitor or an organo-phosphate compound is capable of inducing.

All of the medical evidence in the record is in accord as to the symptoms of viral encephalitis, as distinguished from the symptoms of organo-phosphate poisoning. Organo-phosphate poisoning is characterized by a rapid onset of symptoms, short duration of illness, and either complete recovery or death. The victim also has pinpoint pupils, slow heartbeat, insomnia, nervousness, tearing, muscle twitching, diarrhea, excessive salivation, and lung congestion.

On the other hand, viral encephalitis is characterized by a gradual onset of symptoms, long illness with a slow recovery that often results in residual brain damage. Lethargy, rapid heartbeat, and the elevation of the white blood count in the spinal fluid are also important symptoms of viral encephalitis.

Two doctors testified for plaintiffs. While both admitted the symptoms of viral encephalitis, they nonetheless expressed the opinion that the Skogen boys suffered from organo-phosphate poisoning. In reaching this conclusion, they relied heavily on the assumption that the boys had excessive salivation. Excessive salivation, however, does not appear on the hospital records. The only direct evidence about it was from Harold Skogen, the father. Further, Dr. John Fee, testifying for defendants, stated that excessive salivation would appear on X-rays of the chest as lung congestion. Dr. Fee examined the chest X-rays and testified that the lungs were clear.

The testimony of plaintiff's doctors was adversely affected by cross-examination. Both admitted that the condition suffered by the Skogen boys could have been caused by viral encephalitis.

The defendants presented four medical doctors, all of whom unequivocally testified that the Skogen boys did not suffer from organo-phosphate poisoning. Dr. Mitchell Zavon based his opinion on the fact of the slow onset of the symptoms, the high fever, the changes in the white

.110 to .113 gram per kilogram of body weight and exhibited no adverse reactions. Ten humans were given 2 grams for three consecutive days for a total of 6 grams. The only adverse effects were nausea and diarrhea which left after discontinuation of the dosage. The spray solution used by the Skogen boys contained about 1% Ronnel. In the above tests, the concentrated Ronnel product was used.

In addition, there was lay testimony indicating that individuals had been exposed to Ronnel solutions without any adverse effect.

4. The trial judge, Honorable Edward J. Devitt, in ruling on Motion for New Trial, made the following evaluation of the testimony presented:

" * * * The evidence was overwhelming that there was no connection between the use of the fly spray and the illness of the plaintiffs, and the jury so found in their special verdict. The evidence was most convincing that the Purina Spray and Dip, even if used under the most unfavorable conditions, could not possibly have caused such injuries.

"But because the two young farm boys, of splendid character and reputation and members of a very reputable family, suffered such extensive and shocking injuries, the mere occurrence of the injuries undoubtedly caused great sympathy for them.

"But I am satisfied that the jury's verdict was correct and that the trial was conducted fairly and without prejudice to them, and that the verdict returned was the only one reasonably possible under the evidence."

blood count, the long course of the illness, and the residual nerve damage. He indicated that organo-phospate poisoning could not present such a pattern.

Dr. Gilbert Mannering stated his reasons for not believing the Skogen boys suffered from organo-phosphate poisoning as the low toxicity of the chemical Ronnel and the complete absence of any observation of the symptoms characteristic of organo-phosphate poisoning as set out above.

Dr. Richard Stewart explained the importance of the presence of a high white blood cell count in the spinal fluid of the Skogen boys. He indicated that an abundance of white blood cells point to a viral infection and testified further, that "there is not one single case in the entire English Literature, Scientific Literature, where there has been an abnormal spinal fluid following organo-phosphorous insecticide poisoning."

Dr. Stewart again reviewed the symptoms of viral encephalitis and organo-phosphate poisoning. He noted that a prime sign of viral encephalitis was lethargy, as opposed to the restlessness and insomnia caused by organo-phosphate poisoning. Both of the boys were tired, listless and lethargic. Douglas, he noted, was constipated for 17 days while diarrhea is expected from a victim of poisoning. Dr. Stewart noted that no pinpoint pupils were observed as would be expected in organo-phosphate poisoning, and that while slow heartbeat is a symptom of organo-phosphate poisoning, the boys had just the opposite, a rapid heartbeat. Dr. Stewart repeated the significance of the white blood cells in the spinal fluid of the boys as a positive indication of viral infection. Finally, Dr. Stewart placed great importance on the prolonged course of the illness, as contrasted with the 24-to-48-hour duration of organo-phosphate poisoning and the residual brain damage that is a characteristic of viral encephalitis.

Dr. John Fee again reviewed the comparative symptoms and concluded, as did Drs. Zavon, Mannering and Stewart, that the boys suffered from viral encephalitis. As stated earlier, Dr. Fee specifically pointed out the absence of lung congestion, a symptom of organophosphate poisoning, and as an indication that there was no excessive salivation as assumed by plaintiffs' doctors.

Plaintiffs' family doctor, Dr. Norman Metcalf, who was the first to examine Douglas, made an initial and tentative diagnosis of encephalitis, a diagnosis that was never changed by Dr. Metcalf. When David was admitted to the hospital he was diagnosed there on three occasions as having encephalitis. Though the hospital was informed that the boys had been exposed to this particular spray, the boys were not given well-known antidotes to organo-phosphate poisoning.

Further evidence indicated that viral encephalitis is a disease more common in persons who work on farms. It is a disease easily contracted from farm animals and it usually appears in the summer months.

Considered as a whole, the medical evidence overwhelmingly indicates that the Skogen boys were not the victims of organo-phosphate poisoning.

Supplementing the medical evidence in this case is the asserted fact that two and one-half million pounds of Ronnel have been manufactured and distributed under the various trade names, Korlan 24–E, Korlan 4–E, Korlan–8, T.F.–81, Purina Spray and Dip, and others, since 1947. The Skogen boys used the product as directed. If there were other people who suffered similar injuries through the use, or even the misuse, of the product, it would appear that credible evidence about such incidents would have been introduced into evidence. The Dow Chemical Company unequivocally maintained no such injury has ever been reported.

Admitting sufficiency of the evidence, the plaintiffs contend that they should have a new trial because of alleged prejudicial errors which denied them a fair and impartial trial. We now examine their objections to the trial. Since the objections are many and varied, we will

consolidate discussion of them where the subject matter permits.

Plaintiffs called as witnesses, Bernard F. Beaver and Dr. Warren O. Haberman for the purpose of cross-examining these men under Rule 43(b), Fed.R.Civ. P.[5] Beaver was a chemist in charge of the chemical formulization of Ralston Purina Spray and Dip. There were two or more persons who worked under Beaver's direction in the Chemistry Department. Dr. Haberman was the Manager of the Entomology and Parasitomology Laboratories of Ralston Purina. He had a staff of three or more individuals under him.

After lengthy cross-examination (some 85 pages) of Beaver, at the suggestion of the trial court an objection was made on the basis that Beaver was not a proper adverse party being called for purposes of cross-examination, which objection, of course, was sustained.

Dr. Haberman was called for cross-examination by plaintiffs. After a few questions the objection was made and sustained that he, too, was not a proper party for cross-examination under Rule 43(b).

Rule 43(b) authorizes the calling of an adverse party for cross-examination. In this situation the calling party is free to ask leading questions and to impeach the testimony of his witness. However, a corporation, being an artificial entity, cannot be physically placed on the witness stand. To resolve this problem the Rule authorizes the calling of an "officer, director, or managing agent" as a representative of the adverse corporate party. Obviously, since Beaver and Dr. Haberman are not officers or directors, to be able to call these men and cross-examine them as adverse witnesses, it must be shown that they are "managing agents" of the defendant and not "mere employees" of the corporation.

In this age of large corporate operations, it is often difficult to accurately classify individuals within a business into neat groups of "managing agents" and "mere employees." The past few years have seen a mushrooming of corporations with highly technical and scientific departments. The individuals who head these departments are men of considerable education and extensive scientific knowledge and ability. They no doubt have knowledge of their particular specialty far superior to many of the corporate officers and directors. For this reason, these men generally have considerable authority over the operation of their department, with day-to-day operations being carried on with relative autonomy. Nonetheless, in a strict literal sense, these technicians and scientists are not general "managing agents" of the corporation, even though they are the top personnel of their departments, possessing special knowledge and authority within their sphere of authority not duplicated in the corporate structure. There may be numerous scientific departments within the corporation and each department head may be only one of many equals in the overall corporate picture. These men may have a few employees over whom they exercise managerial authority, and they have no ultimate managerial authority in inherently corporate affairs. Yet it is probably unrealistic to classify these men along with the filing clerks, assembly line worker, and maintenance men, as "mere employees." These technicians and scientists usually have few superiors in the corporate structure and no immediate overseer of their work. They have considerable autonomy in their work, and

5. Rule 43(b), Fed.R.Civ.P. "Scope of Examination and Cross-Examination. A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."

discretion in the operation of their department. Their discoveries and results of their research are the very lifeblood of the corporations, and without doubt their recommendations on matters within their competency have inestimable weight in the shaping of a corporation's business policies. We believe that this situation demands a liberal construction of the Rules that takes into account the practicalities of the business world, the litigation which the business world must face and the underlying rationale of the Rule. As the demands of litigation change with time, the law should make every attempt to accommodate this change to effect the modern demands of justice. The courts, in determining who is a "managing agent" within the terms of Rule 43(b), should not be too technical or literal in their approach and thus disqualify for cross-examination the only persons within the corporation who have knowledge of the subject matter of the litigation. The courts should view each case on an *ad hoc* basis and liberally apply the Rule to reach the demands of justice in each case. Krauss v. Erie R. Co., 16 F.R.D. 126 (S.D.N.Y.1954); Rubin v. General Tire & Rubber Co., 18 F.R.D. 51 (S.D.N.Y.1955).

■ The liberal interpretation of the rule which we favor would hold that an individual is a "managing agent" if: (1) His interests in the litigation are identified with his principal, and (2) He acts with superior authority and general autonomy, being invested with broad powers to exercise his discretion with regard to the subject matter of the litigation. Newark Insurance Company v. Sartain, 20 F.R.D. 583 (N.D.Cal.1957); Kolb v. A. H. Bull Steamship Company, 31 F.R.D. 252 (E.D.N.Y.1962); Warren v. United States, 17 F.R.D. 389 (S.D. N.Y.1955).

If this test were applied, we believe that Beaver and Dr. Haberman would probably be considered managing agents within the meaning of Rule 43(b). It can be fairly said that they would identify with the interests of the principal in this litigation. In their area, they had no immediate superior and they exercised superior authority and general powers of discretion with regard to the chemical properties, testing and experimenting with Purina Spray and Dip, the subject matter of this litigation. Other factors to consider are the extent of their training and knowledge of the subject matter, the fact that they had supervisory powers over other employees, and the ultimate influence they may have on corporate decisions regarding subjects within their competence. In examining all of these factors in light of a liberal application of Rule 43(b), it would seem that these two men were probably subject to call for cross-examination under the Rule and the trial court may have committed error in sustaining the objection that they were not "managing agents" of the adverse corporate party.

■ Our tentative feeling on this point does not demand a reversal of this case. The rule is clear that "harmless error" by the trial court will not warrant a reversal of its judgment. An error is harmless if it is not "inconsistent with substantial justice" or "does not affect the substantial rights of the parties." Rule 61, Fed.R.Civ.P.; Walsh v. Bekins Van Lines Co., 217 F.2d 388 (8 Cir. 1954). We feel that any error of the trial court on this particular issue was harmless.

Beaver was called for cross-examination by plaintiff and was in fact cross-examined without objection for a considerable length of time (85 pages of record). Only after this substantial cross-examination was an objection made and sustained that he was not a proper party. We feel, as did the trial court, that by this time the witness was "exhausted * * * as a practical matter." Although plaintiffs had fully deposed the witness in pre-trial discovery proceedings, at no stage in the proceeding have plaintiffs shown, by offer of proof or otherwise, what additional testimony they expected to elicit from this witness or what real prejudice they suffered by not being allowed to cross-examine the

witness further. At the time Beaver's testimony was interrupted, plaintiffs were apparently trying to prove through Beaver, Purina's negligence in testing and labeling the product, an issue that was not even reached by the jury as evidenced by the response to the special interrogatory.

■ Almost immediately, defendants objected to Dr. Haberman being called for cross-examination. However, after the objection was sustained, plaintiffs' counsel questioned him at great length on a direct examination. No attempt was made to have him declared a hostile witness so that leading questions might be asked. Later in the trial, Dr. Haberman was called by the defendant Ralston Purina in presenting their case in chief, and plaintiffs were then able to fully conduct a lengthy cross-examination of him. Therefore, it is difficult to see any possible prejudice to plaintiffs. As with Beaver, plaintiffs have demonstrated no additional evidence they hoped to receive, nor prejudice they have suffered from the trial court's limitation. When we view the vast amount of evidence that was received on this subject and how the great weight of it supports the finding of the jury, it further convinces us that the almost theoretical limitation on plaintiffs' examination of these two witnesses could not have deprived plaintiffs of any "substantial rights" nor was the limitation "inconsistent with substantial justice."[6]

■ As the result of plaintiffs' trial counsel's failure to heed some cautionary directives and after some conversation at the bench between plaintiffs' trial counsel and the Court (which is not of record), plaintiffs' counsel was reprimanded and cited for contempt. The record reflects on its face that this took place outside the hearing of the jury. Co-counsel for plaintiffs, however, approached the bench in an attempt to inform the Court that he believed the colloquy was audible to the jury. The trial court interrupted him before he was able to make his complaint known. Thereafter, an affidavit was prepared and presented at the next court day to the effect that plaintiffs' co-counsel was sitting near the jury and he was able to overhear the conversation and he believed, therefore, that the jury was able to hear it also. No action was taken on the affidavit by the trial court and nothing more was said about the incident until after the jury returned its verdict adverse to plaintiffs. In a motion for new trial and motion to conform the record, this incident was resurrected. It was then specifically found by the trial court that "as a matter of fact, both the contempt citation of Walter Riordan and comments concerning Mr. Walter Riordan's professional conduct were made at

---

6. Plaintiffs, in their brief, contend that Beaver and Dr. Haberman are at least hostile witnesses within the meaning of Rule 43(b). This contention might be well taken as the witnesses' identity of interest is very close to their corporate employer and their sensitive positions call for a high level of competent performance in their given field. Aside from causation, the main issue here in dispute is the toxicity of Purina Spray and Dip. Since these witnesses have given this product their stamp of approval, it is only natural for them to guard the interests of their employer and their own responsible positions as against the plaintiffs who were vigorously attacking their approved product.

The fact that defendants' counsel allowed Beaver to be cross-examined for some 85 pages indicates acceptance of the fact that Beaver was an unwilling or hostile witness for plaintiffs' cause.

However, at the trial, plaintiffs did not attempt to qualify either Beaver or Dr. Haberman as a hostile witness under the Rule, and thus did not afford the trial judge an opportunity to rule on that point. It is elementary that we should not rule upon a point of law not presented to the trial judge. A trial judge ordinarily should not be charged with error in not deciding correctly a question that he was never asked to decide.

We, however, feel this issue is not material, for, regardless of plaintiffs' failure to present the issue to the trial court, even if it had been presented and ruled adversely to them, no prejudice would have resulted for the same reasons set forth in our consideration of the "managing agent" issue.

the bench, outside the hearing of the jury." Plaintiffs have given us no information to indicate that this factual finding of the trial judge was clearly erroneous. No affidavit of a juror or anyone in the courtroom was presented below, other than the self-serving affidavit of co-counsel for plaintiffs. This is certainly not sufficient for us to overturn the considered finding of fact by the trial court. The trial judge is familiar with the conversation, the tone of voice, the position of the jury, and the accoustics of the courtroom. Certainly, his finding that the conversation was outside the hearing of the jury is entitled to considerable weight.

■ Secondly, plaintiffs did not properly preserve this point for review. If plaintiffs' counsel believed the remarks were being overheard he should have moved for a mistrial and presented what evidence he had to indicate a mistrial was in order. It seems, however, that plaintiffs' counsel preferred to let the action of the trial court stand, not seek a mistrial at this point, yet retain this incident as his "ace in the hole." After receiving an unfavorable verdict, he now attempts to revive this alleged error. It is the most fundamental rule of appellate procedure that a party may not sit idly by and allow the trial court to commit error, wait for a verdict, and complain of the error only if the verdict is unfavorable. Crusan v. Ackmann, 342 F.2d 611 (7 Cir. 1965). Yet, in essence, this is what plaintiffs' counsel did. He chose not to move for a mistrial, apparently deciding not to press the issue and to continue with the trial. Plaintiffs are now bound by that decision. Murrell v. White, 271 F.2d 253 (5 Cir. 1959), cert. denied 362 U.S. 917, 80 S.Ct. 669, 4 L.Ed.2d 738; Fleming v. Lawson, 240 F.2d 119 (10 Cir. 1956).

Finally, we note the careful, cautionary instruction:

"On occasion throughout the trial, counsel have come to the bench for discussion intended to be heard only by the Court. If any of you overheard any of these conversations at the bench, you are to totally disregard them in reaching your conclusions."

■ While we agree that cautionary instructions will not always cure error, such an instruction is important in weighing all the factors to determine whether the action of the trial court adversely affected the rights of the litigants. See, Murrell v. White, supra. Plaintiffs are not entitled to a new trial on the basis of the transactions that took place at the bench.

■ On the record, it appears that the trial judge patiently and impartially allowed plaintiffs' trial counsel extreme latitude in cross-examining witnesses on collateral matters. Only when the Judge's admonitions or cautions to plaintiffs' counsel were repeatedly ignored, was plaintiffs' trial counsel cited for contempt. Even admonitions in the presence of the jury may in certain contexts be permissible and advisable in the interests of maintaining proper judicial decorum and in affording a fair trial to all parties concerned. It has been repeatedly said that a trial judge in the Federal Courts is more than a mere moderator or arbiter. He has the obligation, along with the necessary authority, to actively preside and conduct a fair and impartial trial, to rule out improper questions, and protect witnesses from overzealous cross-examination on collateral and personal matters, particularly where such questions shed no light on the issues involved or the credibility of the witnesses.

A trial counsel who repeatedly ignores the cautionary remarks of a trial judge invites censure. In the contempt incident with which we are here concerned, the trial judge had patiently given plaintiffs' trial counsel a fourth cautionary admonition during a very short period of time. If the Judge's admonitions are ill-taken or arbitrary, they generally show on the record, as a bandaged sore thumb, and relief is usually forthcoming. No situation of that kind is presented in this case. The patience and impartiality of

the trial judge is apparent from the record. On the whole, he was scrupulous in according each side their full day in court.

■ Since the law places the responsibility for the trial of cases in the hands of the trial judge, a large degree of discretion is essential in the conduct of that trial within a broadly defined framework. Among other things, the trial court had discretion on the admission of evidence, (Cotton v. United States, 361 F.2d 673, 676 (8 Cir. 1966); Walton v. Sherwin-Williams Co., 191 F. 2d 277 (8 Cir. 1951), the extent of examination and cross-examination of witnesses, (Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Holmes v. United States, 134 F.2d 125 (8 Cir. 1943), cert. denied 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722), the conduct of trial counsel, (Rochester Civic Theatre, Inc. v. Ramsay, 368 F.2d 748 (8 Cir. 1966), the trial court's comments upon the evidence, (Rowell v. United States, 368 F.2d 957 (8 Cir. 1966), and the order and proper presentation of the evidence, (Lentner v. Lieberstein, 279 F.2d 385 (7 Cir. 1960).)

■ It is with these discretionary matters that the balance of plaintiffs' objections pertain. In their brief, plaintiffs have pointed to many individual instances in which they believe their cross-examination of witnesses was improperly limited by the Court. Without going into burdensome detail, we have examined the questions, the context in which they were asked, and the applicable objections, and we have concluded that there was no abuse of the trial court's broad discretion. Plaintiffs were not deprived of their right of cross-examination. The questions asked were often argumentative, misleading, or assumed facts not in evidence. Such questions are, indeed, objectionable, and the trial court was entirely proper in sustaining the objections. Beyond these specific objections, the trial court properly exercised its discretion.

■ Plaintiffs have pointed to many pieces of evidence they believe were erroneously admitted. No purpose would be served by discussing in detail the numerous pieces of evidence and the objections thereto. Suffice it to say, we have examined the documents and the evidence of the experiments and believe they were properly admitted, either as business records or as experiments conducted under proper conditions. Certainly, we can find no abuse of discretion in the admission of any of this evidence.

■ Plaintiffs sought to introduce a segment of a hospital record that contained a conclusion to the effect that the condition suffered by the Skogen boys was due to the inhalation of insect poisoning. Upon objection, this conclusion was excluded from evidence. Plaintiffs except to this ruling. This is a close and a very difficult problem. Basically, a record of acts or events may be admitted as proof of the truth of these acts or events if they are contemporaneously recorded in the regular course of business. This is a well known exception to the hearsay evidence rule. Wigmore on Evidence § 1517 et seq. (3rd Ed.). Hospital records are generally admissible as business records to show the case history and the injuries suffered, even though the information is technically hearsay. See, 28 U.S.C. § 1732 (Federal shop book statute); Medina v. Erickson, 226 F.2d 475 (9 Cir. 1955), cert. denied 351 U.S. 912, 76 S.Ct. 702, 100 L.Ed. 1446; Tucker v. Leow's Theatre & Realty Corporation, 149 F.2d 677 (2 Cir. 1945). Though such records may of necessity contain some basic conclusions, there is a point at which opinion evidence and expert opinions as to how an accident occurred will be objectionable. Barnes v. Northwest Airlines, 233 Minn. 410, 47 N.W.2d 180, 193 (1951). New York Life Ins. Co. v. Taylor, 79 U.S. App.D.C. 66, 147 F.2d 297 (1944); Brown v. St. Paul City Ry. Co., 241 Minn. 15, 62 N.W.2d 688, 44 A.L.R.2d 535 (1954); Franklin v. Skelly Oil Co., 141 F.2d 568, 153 A.L.R. 156 (10 Cir.

1944); and Otney v. United States, 340 F.2d 696 (10 Cir. 1965).

■ The difficulty is defining the exact point at which conclusions become objectionable. After much consideration, it is our belief that the hearsay opinion as to the cause of plaintiffs' illness contained in this hospital record is objectionable and beyond the scope of the "shop book" or "business records" exception to the hearsay evidence rule, and as such may not be admitted as proof of the ultimate issue in this litigation.

This conclusion of causation is not one that all persons skilled in the art would likely reach. New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297 (1944). It is a conclusion not based upon directly observable facts or well-known tests. See, Thomas v. Hogan, 308 F.2d 355, 360 (4 Cir. 1962). Of necessity it is purely the conclusion of one man, based upon an evaluation judgment which he alone placed upon a number of variable factors and which he was not obligated by law to make. In this case, the party making the conclusionary statement was not shown to be unavailable to testify. If plaintiffs desired the jury to have the benefit of this expert conclusion, they should have called the person who made it, properly qualify him as an expert, and have him so testify in front of the jury. Otherwise, under both Minnesota and Federal practice, this expert opinion is inadmissible hearsay. We do not believe plaintiffs should be allowed to present to the jury this otherwise inadmissible conclusion as to the cause of plaintiffs' condition simply because it fortuitously appears in a hospital record, and thereby deny to defendants the protection afforded by an oath and the opportunity to cross-examine the witness. Brown v. St. Paul City Ry. Co., 241 Minn. 15, 62 N.W.2d 688, 44 A.L.R. 2d 535 (1954); Krug v. Mutual Ben. Health & Accident Ass'n, 120 F.2d 296 (8 Cir. 1941). This type of conclusion on the highly controversial ultimate issue of the cause of plaintiffs' condition does not qualify as an entry made "in the regular course of * * * business" and is consequently inadmissible. Otney v. United States, 340 F.2d 696, 700 (10 Cir. 1965); Franklin v. Skelly Oil Co., supra; New York Life Ins. Co. v. Taylor, supra; see also, Annot. 44 A.L.R.2d 553 and 69 A.L.R.2d 1148, and the cases cited therein.

■ Plaintiffs object to statements and actions of trial counsel for defendants. As we stated in Rochester Civic Theatre, Inc. v. Ramsay, 368 F.2d 748, 754 (8 Cir. 1966), the trial court has a superior vantage point from which to oversee the factual presentation of the case and the conduct of counsel. Consequently, regulating the conduct of counsel is left within the discretion of the trial court. In the case before us, we do not believe the trial court allowed defendants' attorneys to take undue latitudes.

■ The next two objections deal with the order in which the trial court demanded that the evidence be presented, again an area largely within the discretion of the trial court. Lentner v. Lieberstein, 279 F.2d 385 (7 Cir. 1960). Normally, parties are expected to present all of their evidence in their case in chief. Allowance of a party to present additional evidence on rebuttal depends upon the circumstances of the case and rests within the discretion of the individual most able to weigh the competing circumstances, the trial judge. United States v. Prettyman, 142 F.2d 891 (4 Cir. 1944); Wigmore on Evidence, § 1873 (3rd Ed.).

At the time of the rebuttal request, we see that this was a complex case, covering many days of trial and many witnesses, including numerous expert witnesses, producing volumes of complex scientific and medical exhibits, charts, and other data. In this situation, it is most difficult to keep the issues clearly delineated. An orderly presentation of the evidence is essential. Otherwise, the jury might become hopelessly confused.

■■ At the close of defendants' case, plaintiffs sought to call as a rebut-

tal witness a Dr. Quinby. Dr. Quinby apparently was going to testify as to the symptoms of organo-phosphate poisoning as related to the symptoms of the Skogen boys. This evidence should have been offered by plaintiffs during their case in chief. It was cumulative to Dr. Swaiman and Dr. Noran's testimony. We do not believe it has been shown that the trial court abused its discretion by prohibiting the rebuttal testimony.

The issues were known to plaintiffs when they presented their case in chief. In fact, proof that the Skogen boys suffered from insect poisoning was a necessary element in their prima facie case. Likewise, the defense that the Skogen boys did not suffer from insect poisoning was certainly anticipated by plaintiffs. They did not demonstrate to the trial court's satisfaction, nor have they to ours, why Dr. Quinby was not called in plaintiffs' case in chief. It is altogether possible that plaintiffs kept Dr. Quinby in reserve, hoping to achieve some tactical advantage by a dramatic final statement on the issue. We think under all of the enumerated circumstances the trial court did not abuse its discretion in preventing plaintiffs from presenting rebuttal testimony.

Plaintiffs' next objection raises essentially the same problems, the denial of their requests to reopen the case. Again, this is a matter of orderly presentation of evidence which rests within the sound discretion of the trial court. George v. Wiseman, 98 F.2d 923 (10 Cir. 1938); Wigmore on Evidence, § 1877 (3rd Ed.). Dr. Kvistberg initially testified for plaintiffs concerning the toxicity of the Purina Spray and Dip. In its discretion, the trial court allowed plaintiffs to recall Dr. Kvistberg in order to change or modify some of his previous testimony. Now, at the end of the entire case, plaintiffs wanted Dr. Kvistberg to take the stand the third time to offer more additions to his original testimony. The Court denied the request. No abuse of discretion is indicated.

The trial must end at some point, and, as with rebuttal testimony, the trial judge has a positive duty to see that the evidence is presented in an orderly manner, causing as little confusion as possible. The new evidence offered by plaintiffs would have been difficult to link with Dr. Kvistberg's original testimony, which, incidentally, had been thoroughly impeached by defendants. Furthermore, the additional testimony would have probably introduced new and collateral issues, not only confusing the jury but, no doubt, prompting defendants to respond with additional refuting evidence. We think this action of the trial court, as the others, was well within the Court's permissive powers.

Finally, we have examined the comments made by the trial judge which plaintiffs find objectionable, and we find them innocuous, indeed. To us, they seem altogether proper and within the judge's prerogative.

In conclusion, the large bulk of plaintiffs' objections concern matters solely within the sound discretion of the trial judge. In such a case, "this Court cannot retroactively substitute its discretion for that of the trial judge, who had the feel of the case, * * *." Glawe v. Rulon, 284 F.2d 495, 498 (8 Cir. 1960). We believe plaintiffs had a fair trial on the issues. The evidence was fairly presented to the jury, and in spite of the emotional impact naturally favoring the permanently injured plaintiffs, the jury resolved the issue in favor of defendants. The law was correctly given to the jury, the evidence overwhelmingly supported the verdict, and no prejudicial error was committed by the trial court, either in isolation or in the totality of all the alleged errors.

Judgment is affirmed.