Robert L. **BRUNEAU,** et al.

v.

**BORDEN, INC.**

Civ. No. N–82–347 (PCD).

United States District Court, D. Connecticut.

Sept. 29, 1986.

Philip T. Newbury, Jr., Howd & Ludorf, Hartford, Conn., for defendant.

Matthew Shafner, O'Brien, Shafner, Bartinik, Stuart & Kelly, Groton, Conn., for plaintiff.

## RULING ON MOTION IN LIMINE

DORSEY, District Judge.

Plaintiffs are three family members who have brought a products liability action against defendant for personal injuries and property damage allegedly caused by the installation in 1977 of urea-formaldehyde foam insulation in their home. This type of insulation emits formaldehyde gas and has subsequently been banned by the State of Connecticut.

On February 15, 1982, Robert and Karen Bruneau went to the Occupational Medicine Clinic at Yale University School of Medicine. They were examined there by John R. Balmes, M.D., who took their family history and performed a variety of tests. On May 6, 1982, he conveyed his diagnosis and findings in a letter to plaintiffs' former attorney.[1] Therein, he expressed his opinion that certain health problems had been caused by exposure to the foam insulation.

Defendant has moved, in limine, pursuant to Rule 7(b), Fed.R.Civ.P., to exclude the letter as inadmissible hearsay. For the reasons set forth below, defendant's motion is granted.

*Discussion*

It is undisputed that Dr. Balmes' letter is an out-of-court declaration which will be offered for the truth of the matter asserted, i.e., that plaintiffs' symptoms were causally related to urea foam formaldehyde insulation in their home. The letter is hearsay under Fed.R.Evid. 801(c), and inadmissible unless within one of the exceptions specified in Rule 803, Fed.R.Evid.

Plaintiffs claim admissibility as a "business record," Rule 803(6), Fed.R.Evid. That rule provides:

Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of untrustworthiness.

Defendant first claims Dr. Balmes did not treat plaintiffs. Clearly, treatment was provided by the clinic and Dr. Balmes' examination was part of the clinic's procedure. Defendant's claim in this regard is without merit.

Defendant next claims the letter should not be regarded as part of plaintiffs' "chart." The words "chart" or "file" are not determinative for admissibility under Rule 803(6). It depends on whether the document is a "[r]ecord of regularly conducted activity." The letter is presented without reference to the clinic's procedure. It certainly is or was:

(a) a memorandum or report;

(b) a recitation of acts, events, conditions, opinions or diagnosis;

(c) made about three months after the examination;

(d) not recitative of information known by Dr. Balmes;

(e) derived from recitations by plaintiffs, clearly persons with knowledge, setting forth their history of their exposure to urea formaldehyde.

It is not established in the record by a custodian or other qualified witness that the letter was made and kept as a matter of the regular course and practice of the clinic.

Absent a reflection of the latter, the letter would not be admissible. The fact that plaintiffs are the source of the information is not controlling. The rule permits the recording of information from "a person

1. The full text of the letter is reproduced in an appendix to this opinion.

with knowledge." The business entry rule requires the information to be from one whose duty it is to provide the information, impliedly one with a position within the business which kept the records. Yet a doctor's or hospital's records are permitted to include medical history provided by a patient on the theory that a patient's own self-interest is best served by a truthful report. One might skeptically question that principle when the interests of the patient are not limited to his health but, with the pendency of litigation, extend to his interest in a monetary recovery from a lawsuit.

The problem here is that the opinion which is the crux of the report is not purely a medical opinion. While it would be of medical significance, both in diagnosis and treatment, that plaintiffs were exposed to formaldehyde, it is outside the field of medical concern for plaintiffs' diagnosis and/or treatment whether legal causation is established between the exposure and the physical condition. Having expressed a legal opinion on causation, there is a serious question as to whether the rule was intended to cover opinions given in relation to litigation.[2] If that were the intention, all a party need do is consult an expert, obtain a written opinion and an assertion that in written form it was within Rule 803(6), and the writing could come into evidence. The troublesome aspect of such a procedure is that it is totally unfair to an opposing party adversely affected by the opinion. Such would have no opportunity to cross-examine the expert on: his/her qualifications; the facts on which the opinion was based; the reasoning behind the opinion; and alternative theories, reasons, and facts. See *Forward Communications Corp. v. United States*, 608 F.2d 485, 510–11 (Ct.Cl. 1979). Thus, a report of a train accident prepared by the engineer of the train two days after the accident was deemed inadmissible as made in contemplation of litigation. *Palmer v. Hoffman*, 318 U.S. 109, 114–15, 63 S.Ct. 477, 481–82, 87 L.Ed. 645

(1943). The evaluation of a doctor has been subjected to the same limitation. *Yates v. Bair Transport, Inc.*, 249 F.Supp. 681, 688–92 (S.D.N.Y.1965). While the rationale may vary, courts have focused on the ultimate untrustworthiness of opinion beyond diagnosis in medical reports when they are not subjected to the test of cross-examination. As explained in *Skogen v. Dow Chemical Co.*, 375 F.2d 692, 704–05 (8th Cir.1967):

Hospital records are generally admissible as business records to show the case history and the injuries suffered, even though the information is technically hearsay. Though such records may of necessity contain some basic conclusions, there is a point at which opinion evidence and expert opinions as to how an accident occurred will be objectionable.... If plaintiffs desired the jury to have the benefit of this expert conclusion, they should have called the person who made it, properly qualify him as an expert, and have him so testify in front of the jury.... We do not believe plaintiffs should be allowed to present to the jury this otherwise inadmissible conclusion as to the cause of plaintiffs' condition simply because it fortuitously appears in a hospital record, and thereby deny to defendants the protection afforded by an oath and the opportunity to cross-examine the witness. This type of conclusion on the highly controversial ultimate issue of the cause of plaintiffs' condition does not qualify as an entry made "in the regular course of ... business" and is consequently inadmissible.

(Citations omitted). See also Laughlin, "Business Entries and the Like," 46 Iowa L.Rev. 276, 305 (1961) ("Cross-examination gives an assurance of reliability, and the opinion of a doctor not available for cross-examination should not be admissible unless there is an assurance of reliability to take the place of cross-examination.")

---

**2.** It is not without significance that the proffered opinion is not in the clinic record but in a letter to counsel, obviously a scenario more pointed to the litigation than to plaintiffs' treatment.

While a party seeking to exclude evidence "must make an affirmative showing of untrustworthiness," *Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir.1983), under all the circumstances here defendant has raised enough questions about the opinion to warrant its exclusion in the report form. Plaintiffs do not hereby lose the opinion; they merely have to go the extra step and obtain it by deposition, where it may be cross-examined to accord the jury a full view of its merits or lack thereof.

The motion to exclude is granted, without prejudice.

SO ORDERED.

## APPENDIX

Yale-New Haven Medical Center

DANA DIAGNOSTIC CENTER

DANA III

789 Howard Ave., New Haven, Ct. 06504

May 6, 1982

Atty. Peter Melien
81 Broad Street
Milford, CT 06460

Re: Robert Bruneau

# 051–93–06

Karen Bruneau

# 032–37–45

Dear Attorney Melien:

I am writing with regard to the health problems of Mr. and Mrs. Robert Bruneau.

As you know, Mr. and Mrs. Bruneau had their home insulated with a urea-formaldehyde foam product (Borden "Insulspray") in November 1977. Both Mr. and Mrs. Bruneau were in their usual state of good health prior to this time.

Approximately three months after the urea-formaldehyde insulation was sprayed into the walls of their home, Mrs. Bruneau began to experience symptoms of nasal and eye irritation associated with a chronic headache. She was diagnosed by her personal physician, Dr. Brodoff of West Haven, to be suffering from sinusitis. Since then, Mrs. Bruneau has continued to suffer recurrent attacks of sinusitis, despite appropriate medication. She also suffers from chronic throat irritation and recurrent episodes of "bronchitis" associated with wheezing. Because of chronic shortness of breath on exertion, Mrs. Bruneau has been forced to decrease significantly her level of physical activity. Mrs. Bruneau has no past history of allergies or asthma. She is a cigarette smoker and has accumulated 20–25 pack-years of exposure. She has no history of toxic occupational exposures.

Mr. Bruneau did not begin to experience symptoms consistent with sinusitis until approximately one year after the urea-formaldehyde foam insulation was installed. Because he experienced symptoms—dizziness, "ringing" in the ears and a sensation of "congestion" in the ears—Mr. Bruneau was forced to consult several specialists over the next several years before the appropriate diagnosis of chronic sinusitis and rhinitis was made. Mr. Bruneau also has experienced a chronic productive cough and frequent "colds" associated with chest congestion. These symptoms are consistent with the diagnosis of chronic bronchitis. Mr. Bruneau is a cigarette smoker and has accumulated approximately 20 pack-years of exposure. He has no history of toxic occupational exposures.

When we examined Mrs. Bruneau at the clinic on February 15, 1982, we found her to be hoarse, to show evidence of chronic inflammation of the nasal membranes and throat and to have some rhonchi (expiratory noises) over the chest. Mr. Bruneau was noted to have only some rhonchi over his chest.

Pulmonary function testing performed at Yale on March 3, 1982, showed that Mrs. Bruneau does indeed have evidence of bronchial hyperreactivity (an increased tendency for the bronchi to narrow upon the inhalation of irritant substances, the physiologic hallmark of asthma) and that Mr. Bruneau has essentially normal lung function.

In summary, it is my opinion that both Mr. and Mrs. Bruneau are suffering from chronic upper airway (i.e. nose, throat and larynx) irritation/inflammation which is most probably secondary to chronic low level formaldehyde gas exposure from the urea-formaldehyde foam insulation that was installed in their home in 1977. It is also my opinion that Mrs. Bruneau has developed lower airway hyperreactivity (i.e., asthmatic bronchitis) as a result of this formaldehyde exposure. The fact that the level of formaldehyde gas detected in the master bedroom of the Bruneaus' home by the Connecticut State Department of Health was 0.7 PPM in February 1978 supports the conclusion that chronic exposure to formaldehyde is the cause of the symptoms experienced by this unfortunate couple. The fact that their daughter experiences similar problems also supports this conclusion.

I have recommended to Mr. and Mrs. Bruneau that they act to remove the urea-formaldehyde insulation from their home as soon as possible, since continued exposure to formaldehyde will only serve to exacerbate their symptoms and may result in permanent impairment.

If you have any questions, please feel free to contact me at the Yale Occupational Medicine Program Office (436–2846).

Sincerely,

/s/ John R. Balmes

John R. Balmes, M.D.

Occupational Medicine Clinic